# UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| ADVANCED SPINAL CARE & ASSOCIATES LLC D/B/A THE ADVANCED SPINE CENTER and JASON E. LOWENSTEIN MD, PLLC.<br><br>    Plaintiffs,<br><br>    v.<br><br>HORIZON HEALTHCARE SERVICES, INC. D/B/A HORIZON BLUE CROSS BLUE SHIELD OF NEW JERSEY; MULTIPLAN CORP.; MULTIPLAN, INC.; VIANT, INC.; VIANT PAYMENT SYSTEMS, INC., NATIONAL CARE NETWORK, LLC; and MEDICAL AUDIT & REVIEW SOLUTIONS, INC.<br><br>    Defendants. | Civil Action No.:<br>2:23-cv-20716-ES-SDA<br><br>**FIRST AMENDED COMPLAINT**<br><br>**JURY TRIAL DEMAND** |

Plaintiffs Advanced Spinal Care & Associates LLC d/b/a The Advanced Spine Center ("ASCA" or "Advanced Spinal") and Jason E. Lowenstein MD, PLLC ("Lowenstein," together with Advanced Spinal, "Advanced Spinal" or "Plaintiffs"), by and through their attorneys, McKool Smith, P.C., allege as follows in support of their First Amended Complaint against Defendants Horizon Healthcare Services, Inc. d/b/a Horizon Blue Cross Blue Shield of New Jersey ("Horizon"); MultiPlan Corp.; MultiPlan, Inc.; Viant, Inc.; Viant Payment Systems, Inc.; National Care Network, LLC; and Medical Audit & Review Solutions, Inc. (collectively, "MultiPlan" and, together with Horizon, "Defendants").

### INTRODUCTION

1. Advanced Spinal is in the business of changing lives. Its principals are board-certified orthopedic surgeons who specialize in the diagnosis and treatment of complex spinal disorders of the cervical, thoracic, and lumbar spine. Treating a wide range of neck and spine disorders, Advanced Spinal transforms the lives of its patients through surgical intervention. Performing complex surgeries—surgeries that can last more than six hours and require multiple surgeons—using state-of-the-art therapies and techniques, Advanced Spinal routinely treats and corrects debilitating conditions like pediatric scoliosis, spinal stenosis, spina bifida, and other spinal deformities including kyphosis, lordosis, and flat back. As a leader in its field, Advanced Spinal is one of few New Jersey medical practices that cares for both children and adults with spinal deformities. Advanced Spinal works miracles for its patients.

2. This case seeks redress for injuries Defendants' anti-competitive price fixing conspiracy caused Advanced Spinal. Health Insurers[1] (including but not limited to Horizon) have orchestrated a multi-year, ongoing scheme with MultiPlan (MultiPlan, together with Health Insurers, the "Cartel") to drive down payments for medical care rendered by out-of-network healthcare providers, including Advanced Spinal. As a direct result of the Cartel's unlawful depression of payments, Defendants often earn more in fees than Advanced Spinal receives for the rendered care. Horizon, in furtherance of the Cartel and through other fraudulent schemes and tactics, has induced Advanced Spinal to provide care to its insureds under false pretenses of payment in full, only to wrongly deny, or drastically underpay, Advanced Spinal's claims for reimbursement. Through this scheme, Defendants have stolen millions from Advanced Spinal.

3. The Cartel, in which all Defendants participate, is a buyer-side cartel targeted at suppressing the amounts paid to Advanced Spinal. It is embodied in written agreements entered into between Health Insurers, including Horizon, and MultiPlan. MultiPlan concedes the existence of these written agreements.

4. MultiPlan itself operates multiple nationwide networks of "preferred" healthcare providers, known as Preferred Provider Organization ("PPO") networks. It recruits healthcare providers, negotiates reimbursement rates with them, and sets certain quality and credentialing expectations for the healthcare providers in its network. MultiPlan sells access to its PPO network to other Health Insurers.

---

[1] "Health Insurers" refers to all major commercial health insurance companies, also known as "payors," operating in the United States, including but not limited to Horizon. Advanced Spinal has filed a separate lawsuit against MultiPlan and other Health Insurers, raising the same claims as in this First Amended Complaint. *See Advanced Spinal Care & Assocs. LLC v. MultiPlan Corp.*, No. 1:25-cv-00080 (N.D. Ill.), ECF No. 1. That action was assigned as a member case in the multi-district litigation pending against MultiPlan and other defendants in the Northern District of Illinois. *See In re MultiPlan Health Ins. Provider Litig.*, No. 1:24-cv-06795 (N.D. Ill.).

5. As competitors, MultiPlan and competing Health Insurers are supposed to make independent decisions about how much to pay for out-of-network medical services like those Advanced Spinal provides. While each Health Insurer is financially incentivized to minimize payments, they are also incentivized to pay reasonable amounts to ensure healthcare providers continue to provide out-of-network services to their insureds.

6. Health Insurers universally began viewing their obligation to pay out-of-network healthcare services as a "pain point" and "major area of concern" that cut into their exorbitant profits. In an effort to avoid legal liability, Health Insurers sought out third parties to drive down out-of-network costs. For the scheme to work, it was essential that all major Health Insurers used the same third-party repricing service. That was the only way to drive down reimbursement rates while ensuring their insureds continued to have access to the very out-of-network providers being underpaid. MultiPlan presented as the perfect solution.

7. MultiPlan markets its suite of repricing tools as an out-of-network "cost containment" solution. MultiPlan markets itself, and the products it offers, as having industry-wide adoption, which allows it to suppress out-of-network reimbursement payments. Today, virtually every major Health Insurer, including Horizon, participates in the Cartel.

8. The scheme's mechanics are straightforward. MultiPlan and competing Health Insurers agree to share their respective confidential, highly detailed claims data with MultiPlan for use in its repricing algorithm. When a Health Insurer receives a provider's claim for reimbursement for out-of-network services, it sends the claim to MultiPlan and MultiPlan uses its repricing algorithm to generate a reimbursement amount, typically far below the amount the Health Insurer would otherwise pay and far lower than the patients' plan-specific out-of-network benefit requires the plan to pay. MultiPlan then "proposes" the new price to the healthcare provider,

3

giving the provider only days to respond to the "repriced" claim. As a condition of accepting the repriced claim, the provider must agree to forego seeking reimbursement from any other source, effectively locking in the harm caused by the collusive underpayment. MultiPlan receives a cut of the money the Health Insurer withholds from the healthcare provider as a percentage of the "savings." Because all major Health Insurers participate in the Cartel, providers have no leverage and are left with two options: (i) accept the repriced claim, or (ii) engage in a protracted, expensive, and often dead-end appeals process.

9. Even when MultiPlan offers to "negotiate," that negotiation is a farce. As a result of being bombarded with a constant stream of "repriced" reimbursement demands and because the services have already been rendered under false pretense of payment, it is impossible for healthcare providers to negotiate meaningfully or to pursue dispute resolution with respect to individual claims. Any "negotiation" with a Health Insurer, including Horizon, starts from the position of the Cartel's collusive offer to underpay healthcare providers for services provided and invariably ends with the healthcare provider capitulating to an extreme underpayment. This is because the providers are in a comparatively weak bargaining position—faced with the choice of either keeping the lights on or dedicating precious time and resources fighting for the amount of money they are actually entitled to with no guaranteed payment in sight. The inevitable result is what the Cartel is designed to achieve: collusive and systematic underpayment. According to MultiPlan, out-of-network providers accept its reduced reimbursement offers 99.4 percent of the time.

10. By so conspiring, Horizon and the other Health Insurers are able to pay far below the reasonable and customary rate for services. As of 2020, the MultiPlan repricing tool was underpaying 370,000 out-of-network claims submitted by all providers by more than $50 million *per day*. That equates to an annual underpayment of approximately $19 billion.

11.     To be clear, MultiPlan and the Health Insurers are not white knights. The money they withhold from healthcare providers is not passed on to patients. Since the outset of the Cartel, Americans' health insurance costs have continued to rise dramatically[2]:



12.     Even though Advanced Spinal is out of network, insured patients routinely seek care from Advanced Spinal because its doctors are leaders in their field. This should not be a surprise. The critical services Advanced Spinal provides are not inexpensive, but the impact those services have on its patients' lives is priceless. Yet, Horizon habitually refused to compensate Advanced Spinal for these life-changing services.

13.     As an out-of-network provider, Advanced Spinal does not have a written agreement with Horizon and is thus subject to the Cartel's repricing scheme. That is not to say Advanced Spinal has no right to a specific payment. The employers that sponsor the medical-benefit plans for many of Advanced Spinal's patients provide their employees and family members access to out-of-network healthcare providers. This allows beneficiaries the option to choose, for an

---

[2]     *2023 Employer Health Benefits Survey*, Kaiser Fam. Found. (Oct. 18, 2023), https://www.kff.org/report-section/ehbs-2023-section-1-cost-of-health-insurance/#figure114.

additional cost, the best available care like Advanced Spinal, even if that provider is not in Horizon's network. Such plans typically define the rate that Horizon shall reimburse out-of-network providers using reference payment levels published by third parties such as FAIR Health, Inc. ("FAIR Health"). Some of the largest plans in the State of New Jersey, including the State Health Benefits Plan, require Horizon to pay out-of-network medical professionals at the 80th percentile of the FAIR Health benchmark.

14. Horizon's fraudulent and illegal practices—many of which are straight from the Cartel's playbook—have cost Advanced Spinal millions. Advanced Spinal generally bills for its services at the 80th percentile of the FAIR Health benchmark, formerly the Usual, Customary and Reasonable ("UCR") rate. After taking into account patient paid co-insurance, cost-share and deductibles, Advanced Spinal was paid less than $23 million of the more than $182 million Advanced Spinal billed. Horizon underpaid Advanced Spinal by nearly $160 million. Put differently, Advanced Spinal received less than 13 percent of what Advanced Spinal billed.

15. Defendants prioritized illegal profits over patients and providers. Advanced Spinal brings this suit to hold Defendants accountable for their concerted misconduct.

6

**THE PARTIES**

16.     Plaintiff Advanced Spinal Care & Associates LLC d/b/a The Advanced Spine Center is a limited liability company organized under the laws of the State of New Jersey with a principal place of business at 160 East Hanover Ave, Suite 201, Morristown, NJ 07960.  Advanced Spinal Care & Associates LLC includes three board certified, internationally recognized spine surgeons: Dr. Charles A. Gatto, Dr. Jason E. Lowenstein, and Dr. George S. Naseef.  At all relevant times and for all claims at issue in this First Amended Complaint, Advanced Spinal Care & Associates LLC was an out-of-network provider outside of Horizon's provider networks.

17.     Plaintiff Jason E. Lowenstein MD, PLLC is a professional services limited liability company organized under the laws of the State of New York with a principal place of business at 303 2nd Avenue, #19, New York, NY 10003, operating in both New York at NYU Langone Hospital and in Morristown, New Jersey.  Jason E. Lowenstein MD, PLLC and its owner, Dr. Jason E. Lowenstein, are associated with Advanced Spinal Care & Associates LLC.  At all relevant times and for all claims at issue in this First Amended Complaint, Jason E. Lowenstein MD, PLLC was an out-of-network provider outside of Horizon's provider networks.

18.     Defendant Horizon Healthcare Services, Inc. d/b/a/ Horizon Blue Cross Blue Cross Blue Shield of New Jersey ("Horizon") is the only Blue Cross and Blue Shield Association licensee authorized to operate in New Jersey.  Its principal place of business is in Newark, New Jersey.  Horizon is the largest health insurance company in the State of New Jersey.  It provides health insurance coverage and services to more than three million New Jersey residents and has repricing agreements with MultiPlan.

19.     Defendant MultiPlan Corp., the corporate parent of MultiPlan, Inc., is a provider of healthcare data and analytics products and services, incorporated in Delaware and headquartered in New York.  Its principal place of business is located in New York, NY 10003.

20.     Defendant MultiPlan, Inc. is a New York corporation.  Its principal place of business is the same as MultiPlan Corp.'s.  According to MultiPlan Inc.'s website, MultiPlan Inc. has an office located in Naperville, Illinois with more than 300 employees.  In filings with Secretaries of State, MultiPlan Inc. lists its mailing address as 535 E. Diehle Road, Naperville, Illinois, 60563.  MultiPlan Inc.'s Naperville, Illinois office is its largest office by number of employees.  In New Jersey, MultiPlan, Inc., and its subsidiaries Beech Street Corporation and Private Healthcare Systems, Inc., are certified to operate as an Organized Delivery System ("ODS"), including as a PPO through which insureds can get care from any in-network provider without a referral from a primary-care doctor.[3]

21.     Defendants Viant, Inc. and its affiliate, Viant Payment Systems, Inc. (together, "Viant") are payment solutions companies incorporated in Delaware and headquartered in Naperville, Illinois.  MultiPlan acquired Viant in 2010.  Viant, and therefore MultiPlan Corporation, offers auditing and reimbursement services for medical claims and pre-payment services such as facility bill review and professional negotiation between Advanced Spinal and MultiPlan employees in Illinois.

22.     Defendant National Care Network, LLC ("NCN") is a healthcare cost management company incorporated in Delaware and headquartered in Texas.  MultiPlan acquired it in 2011. This acquisition included the Data iSight repricing tool, which provides reimbursement repricing services to Health Insurers and customers and is a trademark of NCN.

23.     Defendant Medical Audit and Review Solutions, Inc. ("MARS") is a Delaware corporation headquartered in Naperville, Illinois, specializing in technology-based medical

---

[3]     *Organized Delivery Systems*, State of N.J. Dep't of Banking & Ins., https://www.nj.gov/dobi/division_insurance/managedcare/mcods.htm (last visited Nov. 19, 2024).

payment repricing and medical necessity determinations. MultiPlan acquired MARS in 2014.

24. In addition to each of the Defendants listed in the paragraphs above, those complicit with the Defendants include the Health Insurers and any other person or entity who has entered into an out-of-network repricing agreement with MultiPlan, used MultiPlan's out-of-network claim repricing tools to process claims for out-of-network healthcare services, or otherwise participated with Defendants in the alleged anticompetitive conduct. The exact number of such co-conspirators is unknown at present but Defendants are jointly and severally liable for all acts or omissions of all such co-conspirators.

## JURISDICTION AND VENUE

25. This action arises under Section 1 of the Sherman Act, 15 U.S.C. § 1; Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15 and 26; ERISA, 29 U.S.C. §§ 1104, 1109, and 1132; and various state laws.

26. This Court has subject matter jurisdiction under 15 U.S.C. § 15 (antitrust), 28 U.S.C. § 1337(a) (antitrust), 29 U.S.C. § 1132(e)(1) (ERISA), 28 U.S.C. § 1331 (federal question), 28 U.S.C. § 1367 (supplemental jurisdiction), and the doctrine of pendent jurisdiction.

27. This Court has personal jurisdiction over MultiPlan because it transacts business throughout the United States, including in this District, and is engaging in the alleged antitrust conspiracy, which has a direct, foreseeable, and intended effect of causing injury to the business or property of persons and entities residing in, located in, or doing business in this District.

28. This Court has personal jurisdiction over Horizon because Horizon is a New Jersey corporation that engages in substantial business activity within this District, including the conduct at issue in this action.

29.     This Court also has personal jurisdiction over Horizon because, by engaging MultiPlan with the knowledge that MultiPlan's services would result in underpayment or non-payment in this District, Horizon and the other Health Insurers that are part of the Cartel participated in an alleged antitrust conspiracy that has had the direct, foreseeable, and intended effect of causing injury to the business or property of persons and entities residing in, located in, or doing business in this District.

30.     In addition to this Court, other courts sitting within the national Blue Cross Blue Shield network have personal jurisdiction over Horizon, including the Northern District of Illinois, where Advanced Spinal is pursuing substantially similar claims against other Health Insurers. *See Advanced Spinal Care & Assocs. LLC v. MultiPlan Corp.*, No. 1:25-cv-00080 (N.D. Ill.), ECF No. 1. Through the BlueCard program and other agreements with Blue Cross Blue Shield of Illinois, Horizon's New Jersey-based clients and licensees have access to providers located in Illinois. Further, upon information and belief, Horizon provides health insurance to insureds living in Illinois.

31.     Venue is appropriate in this District under Section 12 of the Clayton Act, 15 U.S.C. § 22 (nationwide venue for antitrust matters), 29 U.S.C. § 1132(e)(2) (ERISA venue provision), and 28 U.S.C. § 1391(b) and (c) (general venue provisions). The Defendants reside or transact business within this District; are licensed to do business in this District; transact their affairs and carry out interstate trade and commerce, in substantial part, in this District; have an agent and/or can be found in this District; and/or participated in an alleged conspiracy that caused injury in this District. The ERISA plans at issue in this action (the "Plans") were, at least in part, administered in this District, and/or the alleged breaches took place in this District.

## FACTUAL ALLEGATIONS

### I. ADVANCED SPINAL'S PRACTICE

#### A. BACKGROUND

32. Advanced Spinal's industry-leading surgeons provide life altering care for patients across the tristate area, specializing in minimally invasive and state-of-the-art treatments for neck, back, and spinal diseases, as well as trauma-related injuries. Advanced Spinal's reviews confirm the profound impact Advanced Spinal has had on its patients' lives. Patients write that Advanced Spinal turned their "pessimism into optimism," and gave them "a second chance to live a normal life," "pain free." A different patient, who had to be carried into the hospital for surgery due to debilitating back pain, wrote that "two weeks after my surgery I am walking again!" Another wrote, "I felt relief immediately after the surgery and now, 4 months after the surgery, it's as if I never had a problem to begin with." To summarize, as a different patient explained, "[e]ven though the practice is out of my insurance network, it was worth every penny."

33. These testimonials confirm that patients seek out Advanced Spinal because they want the best care for themselves and their families. That choice is important. The Health Insurers, including Horizon, require their insureds to pay higher health insurance premiums, and in some case higher deductibles and co-payments, for the right to choose their own doctor.

34. At all relevant times, Advanced Spinal was an out-of-network provider under Horizon's plans (the Plans). As an out-of-network provider, it did not have a written contract with Horizon. Advanced Spinal made this decision deliberately. It sought to ensure that it was compensated at the prevailing market rate to sufficiently cover its high operational costs, including, among other things, staff, facilities, equipment, and insurance. In-network providers, *i.e.*, doctors who do contract with a health insurance company and accept a negotiated rate as payment for covered services, by contrast, are often forced to accepted inadequate rates that fail to cover their

expenses. Indeed, as one recent study by the American Medical Group Association reports, the median loss for in-network medical groups was $249,000 per physician.[4]

36. As an out-of-network provider, Advanced Spinal depends upon reimbursements from insurers to stay in business. Typically, providers collect only nominal amounts from patients (usually in the form of "co-pays" or "cost share"). They then submit the bill or "claim" for services rendered to the patient's insurer for the remainder of the payment. The amount collected from Horizon and other Health Insurers is critical to Advanced Spinal's survival.

36. Horizon markets and sells medical insurance coverage and related services to individuals, large and small businesses, unions, religious organizations, or government entities throughout the State through "fully insured" plans, or by administering "self-funded" plans on behalf of large employers. As part of this process, it prepares Summary Plan Descriptions ("SPDs"), which may also be called Combined Evidence of Coverage and Disclosure Forms ("Coverage and Disclosure Forms"), that generally set forth whether the plan includes coverage for services provided by out-of-network providers and, if so, the payment terms on which out-of-network providers are to be compensated.[5] These documents are provided to plan participants but typically not out-of-network providers.

37. To entice out-of-network providers to provide services to Horizon insureds, Horizon represents that it will fairly and reasonably compensate out-of-network medical professionals with the knowledge and expectation that out-of-network providers, like Advanced

---

[4] Press Release, Advancing High Performance Health, New Survey Finds Medical Group Operating Costs Continue to Outpace Revenue (Dec. 18, 2023), https://www.amga.org/about-amga/amga-newsroom/press-releases/12182023/.

[5] *See generally Merck Medical Plan for Employees Summary Plan Description*, Horizon Blue Cross Blue Shield of N.J., https://www.horizonblue.com/merck/securecms-documents/2510/2024-merck-medical-plan-for-employees-summary-plan-description.pdf (effective Jan. 1, 2024) (last visited Feb. 12, 2025) [hereinafter *Merck SPD*].

Spinal, will rely upon that representation and provide services to Horizon insureds.

38.     Upon information and belief, the primary benchmark that Horizon uses to calculate the Plans' payments to out-of-network providers is the FAIR Health rate.[6]  Horizon, for example, represents it "uses many sources to calculate its reimbursement rate [for out-of-network providers] . . . including industry resources provided by entities such as FAIR Health, the Centers for Medicare & Medicaid Services ("CMS"), and other databases [*e.g.*, OptumInsight]."[7]

39.     Upon information and belief, several Health Insurers that rely on FAIR Health have typically provide for out-of-network reimbursement rates at the higher "percentiles" of billed charges.  The exact percentile depends on the Health Insurer and a particular enrollee's Plan.  Aetna, Inc. ("Aetna") and The Cigna Group ("Cigna") provide useful examples.  For instance, for some of its "health plans, Aetna uses the 80th percentile FAIR Health rate to calculate how much to pay for out-of-network services."[8]  Likewise, "Cigna offers many plans that allow plan sponsors to choose out-of-network reimbursements rates at a percentile applied to FAIR Health data," which they often set at the 80th percentile.[9]

---

[6]     FAIR Health, discussed in more detail at paragraphs 71–74, collects data from billions of medical claims per year from more than 60 health plans, insurance carriers, and third-party administrators.  Relying on its database of more than 75 billion billed medical services from all 50 States, FAIR Health arranges charges for 10,000 services from low to high and calculates the cost percentiles for a particular service in a specific geographic area.

[7]     *Out-of-Network Payments*, Horizon Blue Cross Blue Shield of N.J., https://www.horizonblue.com/members/education-center/understanding-your-coverage/out-network-costs-ii/out-network-payments (last visited Feb. 12, 2025).

[8]     *Determining Usual, Customary, and Reasonable Charges for Healthcare Services*, Rsch. & Plan. Consultants, LP, 24 (July 7, 2023), https://www.rpcconsulting.com/wp-content/uploads/2023/07/Determining-Usual-Customary-and-Reasonable-Charges-for-Healthcare-Service_Whitepaper_7-1-2023.pdf (citing *Preferred Provider Organization (PPO) Medical Plan Booklet Certificate*, Aetna, http://www.aetna.com/ individuals-families-health-insurance/document-library/sg-ppo.pdf).

[9]     *Id.* (citing *Product Disclosures, Reimbursement for Out-of-Network Services*, Cigna https://www.cigna.com/legal/compliance/disclosures).

40.     So too with Horizon.  Upon information and belief, the Plans that rely on FAIR Health have typically provided for out-of-network reimbursement rates at the higher "percentiles" of billed charges.  The exact percentile depends on the particular enrollee's Plan.  For example, one of Horizon's plan's (Merck, Inc.) publicly available SPDs provides:

> Out-of-Network Benefit: If you or your Covered Dependents receive care from an Out-of-Network provider, the Medical Plan will pay 80% of covered expenses up to the Reasonable and Customary (R&C) Limit and you will be responsible to pay 20% of covered expenses up to the R&C Limit and 100% of covered expenses over the R&C Limit.[10]

That SPD defines the "Reasonable & Customary Limit" for out-of-network providers as the payment rates at 90 percent of FAIR Health.[11]

41.     Some insureds are covered by Plans that require Horizon to compensate out-of-network providers at a percentage multiple of the rates published by the Centers for Medicare and Medicaid Services ("CMS").

42.     As an out-of-network provider, Advanced Spinal relies on these representations, along with pre-approval confirmations, when determining whether to provide services to Horizon insureds and to determine the amount of the patient's cost share.

**B.     ADVANCED SPINAL COMPLIES WITH BEST PRACTICES WHEN PROCESSING MEDICAL CLAIMS**

43.     Before treating a patient in a non-emergent situation, Advanced Spinal's practice is to obtain confirmation from Horizon that the treatment is covered before providing the treatment. Advanced Spinal verifies the patient's eligibility, obtains pre-authorization for the treatment from Horizon, obtains information regarding the patient's financial responsibility (co-pay and cost

---

[10]     *Merck SPD*, *supra* note 5, at 37.

[11]     *Id.* at 40 n.2.

share), and is informed by Horizon of the patient's maximum financial responsibility for the treatment. This occurs via a HIPAA-governed EDI transaction that includes a payor-assigned pre-authorization number. *See* Paragraphs 47–53.

44. After Advanced Spinal treats its patient, a treatment record is created and a standard billing form—CMS-1500 Health Insurance Claim Form or "HCFA"—is prepared. This is essentially a bill prepared by Advanced Spinal that is submitted to Horizon. The HCFA form contains a check-box—No. 27—to indicate whether the bill is submitted pursuant to an accepted assignment. Horizon, and indeed all Health Insurers that are part of the Cartel, records on its internal system whether the claim is pursuant to a valid assignment.

45. The services provided by Advanced Spinal are extraordinarily complex and require incredible and unique skill. The amount that Advanced Spinal billed for those services is generally in line with 80th percentile of FAIR Health and, upon information and belief, is equal to or less than the amount Advanced Spinal, as an out-of-network provider, is entitled to under the Plans.

46. Advanced Spinal follows the industry standard Current Procedural Terminology ("CPT") coding system when billing Horizon for the care and treatment of a Horizon insured. The CPT coding system is designed to communicate uniform information about medical services and procedures among physicians, coders, patients, and payors. Each five-digit CPT code corresponds to a particular medical, surgical, or diagnostic service provided, and Horizon requires that Advanced Spinal identify the applicable CPT codes on the claim.

47. In parallel, and increasingly more common, the information in the HCFA form is translated into a specific, regulation-required ANSI X12 5010 format EDI data set referred to as an "837," which is electronically transmitted to Horizon. In so doing, Advanced Spinal complies with the Horizon Companion Guides that provide instructions for submitting claims.

48. All the claims at issue have an associated 837. The 837 data structure required by Horizon includes an entry for Horizon's own generated pre-authorization number for the specific claim being submitted.

49. Once the HCFA or 837 is transmitted to the insurance company, the insurance company must acknowledge receipt within two days. Upon receiving the 837, Horizon has two options: accept the claim from the out-of-network provider or reject the claim.

50. If Horizon accepts and processes the transaction (claim(s) and incurred charges), then it generates a document known as an "Electronic Remittance Advice" or an "835," which is a record of claims adjudication or adjustment and payment for the submitted claim. An 835 is not a rejection of the claim. The 835 then must be transmitted to the provider's office and maintained by Horizon in the standard or original format for auditability.

51. An 835 was provided by Horizon for each of the claims. Horizon conceals or hides the name of the employer or Plan sponsor on the forms it returns to Advanced Spinal for each claim. For fully insured claims, Horizon does not disclose the identity of the purchasers of the fully insured policy.

52. If Horizon rejects a claim, then no 835 is generated. Instead, it generates an EDI data record referred to as a "999" and transmits that to the provider's office.[12] A rejected claim also triggers the creation of a CCD+ Addenda in the amount of $0.00. Advanced Spinal did not receive a 999 for any of Horizon's claims or a CCD+ Addenda for $0.00.

---

[12] *See Companion Guide for Transaction and Communications/Connectivity Information¸* Horizon Blue Cross and Blue Shield of New Jersey, 12, (2019), https://www.horizonblue.com/sites/default/files/2019-02/External_Companion_Guide.pdf [hereinafter *Horizon's Companion Guide*] ("A 999 will be utilized to indicate functional acknowledgement when a file/transaction is rejected for non-compliance.").

53.     Nonetheless, Horizon's so-called "acceptance" of a claim for processing does not mean that Horizon honors its representation and pays Advanced Spinal the amount on the 837s. Instead, Horizon's policy and practice is to accept the 837 and then negotiate down the claim amount to well-below the prices that Horizon agreed to pay, in an amount determined by the Cartel.

54.     The claims at issue in this case are primarily for medically necessary, covered, elective services rendered to Horizon insureds.

55.     Horizon ignores the Plans' terms and legal requirements for prompt/reasonable payment, purposefully underpaying Advanced Spinal, amongst others, and intentionally delaying the claims adjudication process in the hope that Advanced Spinal will, out of desperation, borne of its relative lack of negotiating power vis-à-vis the Defendants, accept a substantially reduced payment to free themselves from the endless appeals process.

## II.     DEFENDANTS ARE ENGAGED IN A NATIONWIDE PRICE FIXING SCHEME DESIGNED TO THWART OUT-OF-NETWORK PROVIDERS' ABILITY TO COLLECT THE AMOUNTS TO WHICH THEY ARE ENTITLED

56.     The Cartel is a buyers' cartel dating back to at least 2015 between horizontal competitors designed to reduce out-of-network claims reimbursement rates. To achieve this goal, Cartel members agree to: (1) outsource their competitive out-of-network reimbursement rate system to a common repricer, MultiPlan; and (2) exchange among themselves and MultiPlan competitively sensitive data regarding their reimbursement rates and pricing strategies. This joint delegation and exchange of anticompetitive information allows Defendants to coordinate Horizon and other Health Insurer behavior and minimize industry-wide reimbursement rates.

57.     Prior to the Cartel, MultiPlan and Horizon (and other Health Insurers) competed against each other, independently setting reimbursement rates for out-of-network services provided to patients enrolled in their respective networks. This pricing competition served as a

market-wide check on out-of-network reimbursement prices. All Health Insurers had a competitive incentive to keep their out-of-network reimbursement rates at reasonable levels to ensure providers remained willing to provide out-of-network services to plan participants and to preserve the possibility that out-of-network providers would ultimately agree to join their networks.

58. The Cartel extinguished this horizontal competition by, in effect, agreeing to delegate to MultiPlan industry-wide pricing. For healthcare providers, this agreement dramatically suppressed out-of-network reimbursement rates and made recovering the amounts to which they are otherwise entitled a virtual impossibility.

59. As federal antitrust regulators have explained, "replac[ing] once-independent pricing decisions with a shared algorithm," like the Cartel has done, constitutes illegal price-fixing.[13] When "competitors jointly delegate key aspects of their decision-making to a common algorithm,"[14] they "deprive[] the marketplace of independent centers of decision-making" in violation of Section 1 of the Sherman Act. *Copperweld Corp. v. Indep. Tube Corp.*, 467 U.S. 752, 769 (1984).

60. Defendants' fraudulent concealment of their wrongful misconduct has tolled and suspended the running of the statute of limitations concerning Advanced Spinal's claims arising from the conspiracy prior to the four-year period immediately preceding the date this First Amended Complaint was filed. Advanced Spinal was first put on inquiry notice of the Cartel, at

---

[13] Hannah Garden-Monheit & Ken Merber, *Price fixing by algorithin is still price fixing*, Fed. Trade Comm'n Bus. Blog (Mar. 1, 2024), https://www.ftc.gov/business-guidance/blog/2024/03/price-fixing-algorithm-still-price-fixing?utm_campaign=landlords_and_property_ma&utm_content=1709317844&utm_medium=social&utm_source=linkedin.

[14] Statement of Interest of the United States of America at 2, *Duffy v. Yardi Sys., Inc.*, Case No. 2:23-cv-01391-RSL (W.D. Wash. Mar. 1, 2024), ECF No. 149 (cleaned up).

the earliest, on April 7, 2024, when an article published by *The New York Times* raised concerns about MultiPlan's practices based on confidential documents that recently been unsealed in other litigation.

### A.  Cartel Background

#### i.  *Usual and Customary Rates*

61.  For decades, and until the late 1990s, Health Insurers based out-of-network reimbursements on statistical benchmarks for medical costs based on prevailing market rates, *i.e.*, the retail prices charged by doctors in particular geographic areas (UCR rates).

62.  The "UCR" rate refers to the "the prevailing rate doctors charge when they have not negotiated a lower rate with the insurer on an in-network basis."[15]  Because out-of-network providers do not receive the promise of increased patient volume and other benefits (like prompt and predictable payment) that come with a network contract with an insurer, out-of-network providers do not offer discounts to payors on the billed amount.  Pre-negotiated, discounted, in-network rates have never represented reasonable rates of reimbursement for out-of-network claims, and have never been relevant to the calculation of UCR rates.

63.  To properly calculate UCR rates, Health Insurers historically used aggregated, retail medical charge data for like out-of-network healthcare services performed in the same geographic markets.  Based on this data, each Health Insurer exercised its own independent judgment to determine the applicable UCR rate for a particular medical service (often referred to as the "allowed amount").  Each Health Insurer then independently determined what proportion of the UCR rate to pay for plan insureds, which the Health Insurer included in its plan documents to

---

[15]  *Deceptive Health Insurance Industry Practice: Are Consumers Getting What They Paid For?* (Part I): *S. Hr'g. 111-37 Before S. Comm. on Com., Sci., & Transp.*, 111th Cong. 5 (2009).

19

notify insureds.

64.     Historically, many Health Insurers used the 80th percentile of FAIR Health rates to calculate UCR rates.  This method is based on the distribution of charges for similar medical services within a specific geographic area; it pegs the UCR rate to the charge amount below which 80 percent of all submitted charges fall.

65.     Once a healthcare provider receives notice from a Health Insurer of the allowed amount of a claim, that provider has the option of seeking additional reimbursement from the patient for that amount above the allowed amount.  This is known as "balance billing."

        ii.     *Prior Industry Collusion: The Ingenix Cartel (1997-2009)*

66.     The Cartel is a reincarnation of a prior collusive effort by Health Insurers to suppress out-of-network reimbursement rates: the Ingenix Cartel.

67.     Between 1997 and 1998, a UnitedHealth Group, Inc. ("United") subsidiary called Ingenix purchased the two then-existing claims databases used for the calculation of UCR: MDR and PHCS.  It then consolidated those databases in 2001.  With United's acquisition of all UCR claims databases, one of the largest insurance companies in the nation became functionally responsible for setting UCR rates (and, in turn, nationwide reimbursement levels) for out-of-network claims.

68.     Allowing an insurance company to control the nation's sole UCR database created an obvious (and massive) conflict of interest.  Ingenix was financially incentivized to skew its aggregate claims data downwards to reduce overall UCR rates.  That is precisely what happened. For more than a decade, the Health Insurers exploited Ingenix data to depress reimbursement rates artificially for out-of-network claims.

69.     By the late 2000s, providers and consumers began to complain about uncharacteristically low out-of-network claims reimbursement rates, which led doctors to balance

20

bill patients for huge sums. The complaints spurred several investigations and lawsuits over Ingenix's practices, which ultimately revealed that Ingenix was systematically manipulating its data with the purpose and effect of reducing apparent UCR rates.

70.     In 2000, the American Medical Association ("AMA") filed a class action against United alleging that Ingenix improperly reduced out-of-network reimbursements to healthcare providers in violation of the Racketeer Influenced and Corrupt Organizations Act ("RICO") and antitrust laws. The suit settled in 2009, with United agreeing to pay $350 million to class members.

        iii.     *FAIR Health, Inc.*

71.     In February 2008, the New York Attorney General ("NYAG") announced an investigation "into a scheme by health insurers to defraud consumers by manipulating reimbursement rates." In January 2009, NYAG announced a settlement with United. United agreed to shut down Ingenix and contribute $50 million to the formation of an independent non-profit organization, FAIR Health, to take ownership of the Ingenix UCR database. United further agreed to use FAIR Health to determine out-of-network reimbursement rates for at least five years.

72.     Similar settlements followed. Aetna agreed to pay $20 million for the creation of FAIR Health, to contribute untainted data to the new database, and to use FAIR Health for five years. Cigna and WellPoint, Inc. (later known as Anthem and then Elevance Health ["Elevance"]) agreed to pay $10 million and to use FAIR Health for five years.

73.     FAIR Health was incorporated in October 2009 and became available for use in mid-2010. Under the terms of its NYAG settlement, United was required to shut down the Ingenix database within 60 days of the date on which FAIR Health became available for use. As FAIR Health became operational sometime in 2010, the obligation of the settling Health Insurers to use FAIR Health expired sometime in 2015 or early 2016.

21

74. FAIR Health began the gradual process of correcting the skewed UCR database it inherited from United. Over the next seven years, UCR rates rose some 26 percent, reflecting a normalization of the UCR database and a return to a dataset that accurately reflected prevailing market rates free from manipulation. As a result, patients and physicians received more accurate and fair reimbursements from Health Insurers for the medical care they received or provided. But it did not last.

**B.      MultiPlan Enters the Fray**

75. Since its founding in 1980 as a New York-based hospital network, MultiPlan has evolved into a nationwide PPO network of over 1.3 million providers. Health Insurers, including Horizon, "rent" MultiPlan's provider network to decrease the number of claims that fall out-of-network. MultiPlan refers to its PPO network business as "MultiPlan 1.0" and touts it as its major "competitive advantage." Through its network rental business, MultiPlan has aggregated more than 10 petabytes[16] of claim and reimbursement data reflecting what healthcare providers charge, and also what those physicians are willing to accept as payment for those services. MultiPlan refers to this cache of data as the "crown jewels" of its company.

76. As Ingenix was being investigated for antitrust violations and fraud in the late 2000s, MultiPlan began offering a new service to its insurance company clients: "repricing" out-of-network claims. This is a euphemism for working with Health Insurers to reduce payments to providers who perform out-of-network services for insured patients.

77. In August of 2009, mere months after the NYAG settlements closed Ingenix, MultiPlan acquired Viant. U.S. antitrust regulators expressed concerns regarding this acquisition.

---

[16] To put this in context, a single petabyte is roughly equivalent to 20 million tall filing cabinets or 500 billion pages of printed text. This is A LOT of data.

The acquisition of Viant "added analytics-based services" and "repricing solutions" to MultiPlan's business portfolio.

78.     In June 2011, MultiPlan acquired NCN and its "Data iSight" repricing tool, which would become central to the Cartel's scheme.  According to MultiPlan's former CEO, Data iSight soon "became the foundation of [MultiPlan's] analytics business."  In 2014, MultiPlan added an additional company, MARS, once again purchasing a repricing technology provider.  Around June 2023, MultiPlan introduced a new "AI-enabled" out-of-network claim repricing methodology known as "Pro Pricer."  MultiPlan claims that Pro Pricer will reprice out-of-network claims for competing Health Insurers using over 40 years of pricing data.

79.     Through these acquisitions, MultiPlan became the "leader in out-of-network cost containment."  In 2019, MultiPlan claimed to process over 135 million out-of-network healthcare claims, totaling $106 billion in billed charges, and generating north of $19 billion in "savings" for its customers.[17]  In 2022, MultiPlan claimed to process 546 million claims totaling over $155 billion in billed charges, and to identify $22.3 billion in "savings" for payor clients.  By contrast, its next closest competitor, Zelis, a company that reprices out-of-network claims based on a UCR benchmark, processes only about 2 million out-of-network claims a year.

80.     MultiPlan's analytic tools, Pro Pricer, Viant, MARS, and Data iSight, are used by the Cartel to "reprice" out-of-network insurance claims.  These products calculate a reimbursement amount for out-of-network healthcare services that is far less than the insurance company would otherwise pay and far less than the healthcare provider's claim for reimbursement, in a manner that can be coordinated and standardized between and among the Health Insurers.  MultiPlan

---

[17]     *Churchill Capital Corp III Proxy Statement Schedule 14A (Form DEFA14A)*, SEC, https://www.sec.gov/Archives/edgar/data/1793229/000110465920096934/tm2028994-2_defa14a.htm (last visited Nov. 19, 2024).

presented the perfect vehicle for collusion. By using MultiPlan as the sole (or the primary) repricer, Health Insurers, including Horizon, could fix pricing and avoid (or at least try to avoid) the liability of running their own repricing system like United's Ingenix.

81.     Large insurers, including Cartel members like Aetna, Cigna, and United, ran out the clock on their mandatory five-year obligation to use FAIR Health and then promptly abandoned FAIR Health's accurate, transparent, and impartial pricing mechanisms in favor of Data iSight's sham algorithm that allowed Health Insurers to, in effect, jointly set their own low prices for medical care. Indeed, Health Insurers flocked to MultiPlan's claims repricing services almost immediately after the FAIR Health agreements lapsed:

- In 2015, Cigna completed its five-year obligation to use FAIR Health. In 2015, it contracted with MultiPlan to use its claims repricing services.

- In 2015, Aetna completed its five-year obligation to use FAIR Health. On May 1, 2015, Aetna contracted with MultiPlan to use its claims repricing services.

- In 2016, United completed its five-year obligation to use FAIR Health. In 2016, United contracted with MultiPlan to use its claims repricing services for parts of its business, and further expanded such use in 2017.

- Other Health Insurers also began using MultiPlan to reprice their out-of-network claims around the same time.

82.     MultiPlan has entered into contracts with over 700 healthcare payors, including with the top 15 largest Health Insurers, and has told investors that it "is a Core Strategic Partner to All Top Commercial Payors."[18] This shift reflected an understanding among major Health Insurers that they all had to undertake their scheme together to ensure its success.

83.     These agreements set forth how Health Insurers will transmit the out-of-network

---

[18]     *MultiPlan Q2 2020 results and Business update*, MultiPlan (Nov. 12, 2020), https://s26.q4cdn.com/607044225/files/doc_financials/2020/q3/MultiPlan-Q3-Earnings-Presentation_11-12-2020.pdf.

claims they receive to MultiPlan, how MultiPlan will handle the claims once it receives them, and what repricing method would be used. In other words, Defendants have entered into agreements that explicitly discuss the methodology they will use to fix prices for out-of-network services.

### C. Market Definitions and Market Effects

84. The relevant product market for purposes of Advanced Spinal's claims is the market for reimbursements paid by commercial insurers to healthcare providers for claims processed as out-of-network medical services. In this market and its submarkets, healthcare providers like Advanced Spinal function as sellers of out-of-network medical care, while the Defendants function as buyers of those services. While healthcare providers can receive reimbursement payments from governmental sources, such as Medicare, Medicaid, and Tricare, those sources of payment are not viable alternatives for commercial reimbursements and do not compete against commercial health insurance. *See In re Blue Cross Blue Shield Antitrust Litig.*, 2017 WL 2797267 at *5–6, *9 (N.D. Ala. June 28, 2017) (noting that "[s]ellers of healthcare goods and services are not in a position to forgo sales to commercial buyers," in part, because "the prices paid to healthcare providers by the government programs . . . are lower than the prices paid for the commercial health plans").

85. A widely accepted method for determining the scope of a relevant antitrust market is to assess whether a hypothetical monopolist could impose a small but significant non-transitory increase in price ("SSNIP") in the proposed market. The tests employed by antitrust enforcement agencies in the United States, Canada, and European Union use a 5 percent increase in SSNIP, which is widely considered the appropriate value to identify a monopoly. Despite decreasing reimbursement rates for out-of-network services substantially from the prior FAIR Health and UCR charges that existed in the pre-conspiracy period, healthcare providers continued to provide out-of-network services. This suggests that a SSNIP would not result in a sufficient number of

healthcare providers switching to other forms of reimbursement, such as services for government-payors or in-network services.

86.     The relevant geographic market for purposes of Advanced Spinal's claims is the United States.  Medical providers in the United States cannot practically turn to payors in other countries, where medical insurance is uncommon and nearly all medical care is administered by governments, for reimbursement for out-of-network services.  Healthcare providers can, however, practically turn to commercial insurers located in other parts of the United States.

**D.     How the Conspirators Depress Reimbursement Rates**

87.     MultiPlan markets Data iSight as a highly accurate, fair, and transparent way to calculate rates based on certain reasonable benchmarks.  In reality, MultiPlan manipulates Data iSight to generate artificially low reimbursement rates.  The reimbursement amounts offered to physicians are not a result of any defensible algorithm.  There is no adjustment for the local cost-of-living where the provider is located.  Defendants do not negotiate with providers dissatisfied with the reimbursement offered despite claiming that they do.  It is an iron-fisted repricing scheme.

88.     MultiPlan (like Ingenix) includes in its dataset payments made pursuant to network agreements.  As discussed above, in-network rates are heavily discounted and do not represent reasonable benchmarks for the reimbursement of out-of-network claims because a significant reason for accepting discounted in-network rates is the benefits that come with being in-network, *e.g.*, increased patient volume attributable to advertising and referral services.  No such ancillary value flows to out-of-network providers.  These in-network reimbursements are nonetheless fed to Data iSight by MultiPlan for the purposes of suppressing apparent "typical" or "median" reimbursement levels for out-of-network care.  Data iSight then formulates an "initial target reimbursement amount" that is detached from the "median" reimbursement rate for out-of-network providers.  The result is a "garbage in, garbage out" offered payment amount.

26

89. After MultiPlan uses Data iSight to calculate this "fair" reimbursement value based on junk data, it "overrides" the algorithm by instructing Health Insurers to enter manual overrides, like caps and floors on payment. These pre-agreed upon reimbursement rates are far less than the Health Insurer would otherwise pay, far less than the healthcare provider's claim for reimbursement, and far less than the UCR rate, *i.e.*, FAIR Health, for the often life-improving services provided by practitioners such as Advanced Spinal. Overriding provides MultiPlan an additional means to control and coordinate Health Insurer behavior, thereby reducing member and provider "abrasion" and accelerating the Cartel's goal of suppressing industry-wide out-of-network reimbursement rates. As discussed below at Paragraphs 109–12, MultiPlan and Horizon, as well as other Health Insurers, implement these overrides in concert.

90. When a Health Insurer receives a claim from an out-of-network provider, the Health Insurer sends the claim to MultiPlan. Next, MultiPlan can instruct Health Insurers to apply additional overrides to determine the final reimbursement amount. Particularly critical here, the rate determinations generated by these overrides often do not take into account geographical differences in the cost of key inputs like labor.[19] For example, paying around 120 percent of the government-set Medicare rate "sounds fair, maybe even generous," one MultiPlan document states, but this is "inherently misleading" because "the average consumer does not understand just how low Medicare rates are."[20] Data iSight often recommends prices between 160 to 260 percent of Medicare rates, amounts former MultiPlan employees described as "ridiculously low" and

---

[19] Any legitimate manner of calculating out-of-network reimbursements would take into account the geographic differences in the cost of providing medical care. The cost of living, and therefore wages, varies widely state-by-state; and within states, it varies according to whether an area is urban, suburban, or rural.

[20] *See* Chris Hamby, *In Battle Over Health Care Costs, Private Equity Plays Both Sides*, N.Y. Times, (Apr. 7, 2024), https://www.nytimes.com/2024/04/07/us/health-insurance-medical-bills-private-equity.html.

"crazy low."[21]

91.    After determining a payment amount via the Data iSight methodology, MultiPlan, on behalf of the Health Insurers, "negotiates" payment with providers on a take-it-or-leave-it basis.  If the medical biller tries to negotiate for a higher rate with MultiPlan then MultiPlan says it is not the Health Insurer and does not have authorization to increase the payment offer.  If the biller asks the Health Insurer how MultiPlan reprices its claims, the Health Insurer explains it is not responsible for MultiPlan's pricing.

92.    But it is not enough simply to force providers to accept the low payment amounts calculated by Data iSight.  To avoid patient backlash and subscriber loss for its Health Insurer clients, the Cartel must also ensure that providers will not seek to collect the unpaid portion of the bill from the patient.  So, MultiPlan conditions all offers of payment on the provider's promise not to "bill the Patient, or financial responsible party, for the difference between the Billed Charges and the Proposed Amount [*i.e.*, the payment offer]."

93.    Because virtually every major commercial healthcare payor in the United States is in on the repricing conspiracy, out-of-network providers are left with no practical option but to accept the reimbursement amount imposed by the Cartel.

**E.    Evidence of a Horizontal Price Fixing Scheme**

94.    The conspiracy by the Cartel is supported by both direct evidence of a conspiracy (such as the written agreements, information shared and communications between co-conspirators, and public statements to healthcare providers and investors), and circumstantial evidence (such as their prior history of collusion, the high levels of concentration in the health insurance market, and the Cartel's many opportunities to collude).

---

[21]    *Id.*

28

95. The Cartel members conspired to fix prices for the reimbursement of out-of-network medical services, because the lower the prices were suppressed, the more money the Cartel members stood to make. The Cartel members agreed, in writing, to coordinate their reimbursement strategies rather than to compete and agreed, also in writing, on a common methodology by which to do so. They exchanged confidential business information which, in a competitive market, they would (and were required to) have guarded from their competitors. They capitalized on numerous opportunities to collude, often meeting to discuss openly how to further their scheme.

    i.   *MultiPlan and the Health Insurers Are Competitors*

96. MultiPlan and Horizon (and the other Health Insurers) operate competing PPO networks.

97. In an August 2020 presentation, MultiPlan's then-Chief Revenue Officer Dale White explained that MultiPlan "compete[s] with regional PPOs . . . and network aggregators[.]" In his more recent role as CEO, Mr. White admitted that "Our clients are our competitors; our competitors are our clients."

    ii.   *MultiPlan and the Health Insurers Nonetheless Agree to Fix Prices*

98. As part of their anticompetitive agreements, the Health Insurers agree to work with MultiPlan to select a price it will use to "compensate" providers. The agreement contemplates that this rate will be determined according to business criteria mutually agreed upon between the Health Insurer and MultiPlan. That rate either could be a fixed dollar value or benchmarked to a percentage of the prevailing Medicare reimbursement rates. Each agreement incorporates by reference MultiPlan's "Data iSight Preferences form," which sets forth the "overrides" that the Health Insurers and MultiPlan selected to apply to their claims. Some versions contain an exhibit or amendment titled "Repricing Services" that allows the competing Health Insurer to route its

out-of-network claims to MultiPlan for repricing via a direct electronic data interchange or a web-based interface.

99.     One such example is the January 1, 2011, Network Rental Agreement between Aetna and MultiPlan, which was made public on December 22, 2021, when Aetna filed it with the Washington State Insurance Commissioner.  *See* Ex. B, Aetna Agreement Attachment at 1 ("Statement of Work and Services").  That agreement reads, in relevant part, that MultiPlan will provide Aetna with an "integrated health cost containment program . . . .  The program will utilize proprietary and non-proprietary cost-savings methods which include: Entity Networks, Negotiation Services, Network Management Services . . . ." *Id.*

100.    Similarly, in 2014, Cigna and MultiPlan entered into Master Services Agreements that have been amended several times.  On April 1, 2015, Cigna and MultiPlan entered into Statement of Work No. 4, which was made public in November 2023 in *TML Recovery, LLC v. Cigna Corp.*, Case No. 8:20-cv-00269-DOC-JDE (C.D. Cal.).  This Statement of Work covered repricing of inpatient and outpatient services using MultiPlan's Data iSight product.  The publicly filed version of the Cigna Statement of Work is redacted and does not reflect the percent of savings MultiPlan gets paid on repriced claims.

101.    Beginning on July 1, 2017, United and MultiPlan entered into an explicit agreement to suppress out-of-network health insurance reimbursement prices.  United and MultiPlan implemented this agreement by means of an Amendment to the Network Access Agreement (originally entered by United and MultiPlan on January 1, 2010) stating that United would send out-of-network claims to MultiPlan via an electronic data interchange, MultiPlan would use its pricing methodology to "reprice" those submitted claims, MultiPlan would take over the negotiation of those submitted out-of-network claims, and finally United and MultiPlan would

30

split the revenue generated by underpaying providers for their out-of- network claims.

102.   A June 1, 2017, Administrative Services Agreement between Owens & Minor Medical, Inc. and a subsidiary of Elevance states that Elevance had begun using MultiPlan to set prices for out-of-network goods and services.  Specifically, Elevance began using MultiPlan's Data iSight pricing formula.

103.   MultiPlan has also entered into such a contract with Horizon.  MultiPlan is Horizon's primary repricing company, engaging the Doctors to "negotiate" claims for services the Doctors rendered to Horizon insureds.  Horizon has publicly disclosed that it contracts with MultiPlan.  *See Cost Containment Express, LLC v. Horizon Healthcare Servs., Inc.*, 2017 WL 5951619, at *3 (D.N.J. Nov. 30, 2017) (noting in this discovery dispute that Horizon "already provided Plaintiff with information on its contract with MultiPlan, Inc.").

104.   MultiPlan openly admits to entering into these agreements with its competitors.  In its SEC financial filings and in investor calls, MultiPlan touts the number and scope of its contracts:

> We believe we have strong relationships with our customers, which include substantially all of the largest health plans and their [administrator] platforms.  Contract terms with larger customers are often three years and as many as five years, while mid- to small-sized customer contracts are often annual and typically include automatic one-year renewals.

105.   In 2021, Sean Crandell, the Senior Vice President of Healthcare Economics at MultiPlan, testified under oath that "all of the top 10 insurers in the U.S." are MultiPlan customers. MultiPlan told investors the same thing in a 2020 presentation.

106.   As of October 24, 2024, MultiPlan touts on its website that "700 healthcare payors—including all 15 of the nation's top 15 healthcare payors" in the country have agreed to use MultiPlan's "payment" services and contribute to "bending the cost curve in healthcare"

31

through MultiPlan.[22] Each of these "top 15" Health Insurers compete with MultiPlan's PPO networks to attract healthcare providers to become in-network and to induce healthcare providers to treat out-of-network patients through the payment of competitive reimbursement rates.[23]

107. Health Insurers, too, admit to the existence of these agreements to healthcare providers, informing providers that they have "contracted with MultiPlan to facilitate resolution of the above referenced services due to the Provider being out of network for this claim."

108. For instance, Aetna's May 2022 disclosures state that MultiPlan is one of its external pricing vendors and that it will use Data iSight to price out-of-network claims, including using a MultiPlan "advocate" to negotiate with providers on a member's behalf. United also provides a disclaimer regarding out-of-network providers in which it states that one methodology that may be used to establish the reimbursement amount for out-of-network claims is Viant, a subsidiary of MultiPlan.

109. Upon information and belief, every Cartel member knows that its competitors have entered into substantially the same agreement with MultiPlan. They know these agreements require their competitors to use the same methodology—deploying the Data iSight "algorithm" to reduce claims according to their handpicked overrides—to fix the price of out-of-network

---

[22] MultiPlan, https://www.multiplan.us/company/ (last visited Nov. 19, 2024).

[23] According to the AMA's 2024 report on competition in health insurance markets, the commercial market for health insurance in the United States is highly competitive. Ninety-five percent of the Metropolitan Statistical Areas tested have "highly concentrated" markets, and 47 percent are dominated by a single health insurer with 50 percent or more of the market share. *Competition in Health Insurance: A comprehensive study of U.S. markets*, Am. Med. Ass'n, 2, https://www.ama-assn.org/system/files/competition-health-insurance-us-markets.pdf (last visited Nov. 21, 2024). Nationwide, the "Combined Blues" control approximately 42 percent of the United States market share, followed closely by United (15 percent), Elevance (12 percent), Aetna (12 percent), and Cigna (11 percent)—together, 92 percent of the U.S. market. *Id.* at 11. The study concluded that "[t]he majority of health insurance markets are ripe for the exercise of health insurer market power." *Id.* at 16.

healthcare.

110.    From the language of the agreements, they know that MultiPlan colludes with their competitors, the same way MultiPlan colluded with them, to ensure that the Cartel picks essentially the same (even if not identical) overrides of Data iSight's "fair" reimbursement rate.  Each of the members of the Cartel leveraged the agreements with MultiPlan to set reimbursement rates well below both (a) the amount a competitive market would bear, and (b) the amount of the out-of-network reimbursement rates set forth in the patients' SPDs.

111.    They know that their competitors have all agreed to share their data with MultiPlan to facilitate Data iSight's operations.  So they know that they will benefit from their competitors' data in the same way that their competitors will benefit from theirs.

112.    And Cartel members know how their competitors are exercising their rights under their agreements because, as described below, they regularly meet to discuss their efforts on behalf of the Cartel.

iii.    *Communications Between Cartel Members*

a.   Industry Meetings

113.    MultiPlan maintains a Client Advisory Board that hosts annual multi-day retreats for Health Insurer executives and regularly schedules other events with Cartel Defendants. MultiPlan's 30(b)(6) witness testified in *LD v. United Behavioral Health*, Case No. 4:20-cv-02254-YGR (N.D. Cal.), that the meetings bring clients together to discuss "industries" and so "the group that comes can talk amongst their peers."

114.    In 2019, MultiPlan hosted a Client Advisory Board meeting at the luxury spa resort Montage Laguna Beach in Orange County, California.  Executives from MultiPlan, United, Aetna, Cigna, Humana, and several other Health Insurers attended.

115.    John Haben, the former Vice President of Networks for United, and Rebecca Paradise, Vice President of Out-of-Network Strategy for United, attended.  Under oath, Ms. Paradise agreed that "a lot of people in the insurance industry" were also at the meeting.[24]  At the meeting, MultiPlan's then Vice President of Sales and Account Management, Dale White, presented on ways that commercial Health Insurers could "overcom[e] obstacles" with respect to cutting out-of-network pricing.  MultiPlan's presentations at Client Advisory Board retreats regularly cover cost reductions achieved through its claims repricing service.

116.    MultiPlan also uses the Client Advisory Board meetings to draw new members into the Cartel.  According to a 2017 MultiPlan document, the 2015 Client Advisory Board meeting featured prospective clients seated next to existing clients at dinner for this purpose.

117.    From September 26 to 28, 2021, MultiPlan's Client Advisory Board returned to the Montage Laguna Beach resort for another retreat.

118.    MultiPlan has hosted other such Client Advisory Board meetings on a regular basis, facilitating collusion among the members of the Cartel.  For example, the road shows hosted by MultiPlan provide additional opportunities for the members of the Cartel to conspire.

119.    Members of the Cartel have extensive additional opportunities to conspire through other industry linkages, for example, as members of industry associations such as AHIP (formerly "America's Health Insurance Plans").  Health Insurers including Aetna, Centene, Cigna, CVS Health, Elevance, HCSC, Humana, Horizon, and many others are members of AHIP.

120.    As AHIP states, it "plays an important role in bringing together member companies and facilitating dialogues to advocate on shared interests."  Indeed, AHIP's Board of Directors is

---

[24]    *Fremont Emergency Servs. (Mandavis) Ltd. v. United Healthcare Ins. Co.*, No. A-19-792978-B (Nev. Dist. Ct.), Trial Tr. vol. 11, at 229.

34

a "who's who" of Health Insurer executives, including Gary St. Hilaire, President & CEO of Horizon, and other industry leaders:

- David Cordani, Chairman and CEO of Cigna;

- Gail K. Boudreaux, President and CEO of Elevance;

- Sarah London, CEO of Centene;

- Bruce D. Broussard, President and CEO of Humana; and

- Maurice Smith, President, CEO and Vice Chair of Health Care Services Corporation.

121. In addition, AHIP's 2024 Advisory Board includes, among other Health Insurer insiders:

- David J. Brailer, Executive Vice President & Chief Health Officer of Cigna Group;

- Bechara Choucai, Executive Vice President & Chief Health Officer of Kaiser Permanente;

- Kourtney Cruz, Senior Vice President, Government Markets of Independence Blue Cross;

- M. Catharine Moffit, Senior Vice President & Chief Medical Officer of Aetna; and

- Shawn Wang, Chief AI Officer of Elevance.

122. It is no surprise that AHIP's chief executive, Mike Tuffin, came from United—the largest health insurer in the Country and architect of the Ingenix scheme. Mr. Tuffin served as head of communications at AHIP from 2003 to 2012 before joining United as Senior Vice President of External Affairs from 2015 until December 2023 when he returned to lead AHIP.

123. AHIP hosts conferences, committee meetings, and board meetings multiple times a year where its members participate in private, closed-door meetings. In 2023, MultiPlan sponsored AHIP's Annual Conference. MultiPlan representatives also attended AHIP's 2023

Annual Conference from June 13 to 15 in Portland, Oregon.

124.    The fact that members of the Cartel regularly gather together at closed door retreats such as MultiPlan's Client Advisory Board meetings, at MultiPlan's road shows, and at industry events such as AHIP's conferences, board meetings, and committee meetings is circumstantial evidence that their parallel conduct is part of a common scheme to suppress reimbursement rates.

125.    A California federal court examining the Ingenix scheme held that plaintiffs challenging Ingenix's relationship with many of the same Cartel members sufficiently alleged a *per se* horizontal price-fixing agreement, in significant part based upon the opportunities to conspire provided by their concurrent membership in AHIP and attendance at AHIP events. *In re WellPoint, Inc. Out-of-Network "UCR" Rates Litig.*, 865 F. Supp. 2d 1002, 1028 (C.D. Cal. 2011).

b.    Communications with United

126.    On or around October 1, 2015, MultiPlan sent United a presentation titled, "Data iSight: Maximize Savings Using a Patented Methodology." This presentation argued that United would substantially increase its revenues if it stopped independently pricing out-of-network reimbursements to healthcare providers and used MultiPlan's pricing methodology instead.

127.    In 2016, Dale White wrote in an email to United executives stating that seven of United's top 10 competitors were using MultiPlan's repricing services. Mr. White urged that: "[i]mplementation of these initiatives in 2016 will go a long way to bring United back into alignment with its primary competitor group [*i.e.*, Blue Cross Blue Shield licensees, Cigna, Aetna] on managing out-of-network costs."

128.    Indeed, one of the recipients of Mr. White's email, Rebecca Paradise, explained that a key factor in United's decision to agree to use MultiPlan's out-of-network reimbursement suppression technology was that the technology "was widely used by our competitors."

36

129.    Mr. White told another United executive, John Haben, that by agreeing to use the 350 percent of Medicare rates formula in Data iSight, United would "be in line with another competitor" and "leading the pack along with another competitor."  This information about competitor-pricing practices exploited competitively sensitive data that would not have been shared among Health Insurers but for the Cartel.

130.    In a September 8, 2016, email to Lauren Paidosh (another United employee), Mr. Haben wrote that "MultiPlan said seven of our top ten competitors use the tool today."  He continued: "BCBS [Blue Cross Blue Shield] is even more aggressive and is accessing the option of moving DIS [Data iSight] up even higher to have IPR/OPR (R&C repricing) which is option 3 . . . ."  In this email, Mr. Haben demonstrated specific knowledge of the pricing "option" adopted by United's competitive rival, Blue Cross Blue Shield, in MultiPlan's Data iSight program.

131.    In a non-public presentation that MultiPlan provided to United, MultiPlan explained that its proprietary pricing methodology would generate "significant savings," *i.e.*, underpayments to providers, "on non-contracted bills."  MultiPlan also noted that, although its pricing methodology is "configurable," it is guaranteed to set out-of-network prices that are lower than the UCR prices for out-of-network claims that existed prior to the Cartel.

132.    After instructing Health Insurers on being in "alignment" at 350 percent of CMS, MultiPlan pushed to cut out-of-network reimbursement rates further.  For example, in a September 29, 2019, presentation to United titled "Competitive Landscape for Cost Management," MultiPlan told United that it was 10 years behind its competitors in cutting out-of-network reimbursements, and urged United to cut its reimbursement rates further.

133.    Mr. Haben later testified that United initially agreed with MultiPlan to suppress out-of-network claims in a less aggressive manner that put United in the "the pack of its peers."

37

Over time, United became more aggressive and agreed with MultiPlan to implement lower reimbursement formulas in Data iSight, consistent with others in the industry. United reduced its payment ceiling from 500 percent of Medicare rates in 2016, to 350 percent in 2018, and 250 percent thereafter.

134. MultiPlan and United knew this was a substantial cut relative to the FAIR Health and UCR out-of-network prices that predominated prior to the Cartel. In a secret August 2019 white paper that was disseminated to United and others, MultiPlan confided that Medicare-referenced pricing was "inherently misleading" because most people "do[] not understand how low Medicare rates are." The white paper continued, "[t]he gap between [billed charges] and the barebones Medicare reimbursement can be significant." In other words, Defendants price-fixing scheme was intentionally misleading, and calculated to generate significant underpayments for providers.

135. MultiPlan routinely shares these white papers with other members of the Cartel.

136. Recent reporting by *The New York Times* confirmed that MultiPlan acts as a middle man for the Cartel members to communicate. Its April 7, 2024 exposé stated that MultiPlan "told insurers what unnamed competitors were doing, documents and interviews show." *The Times* quoted Lisa McDonnel, a United executive, who wrote that "[MultiPlan] did not specifically name competitors but from what he did say we were able to glean who was who."

          c.   Communications with Cigna

137. In March 2016, officials from MultiPlan and Cigna met to discuss ways they could reduce out-of-network reimbursement rates. Cigna displayed a slide deck outlining how it planned to work with MultiPlan to slash its out-of-network reimbursements. This meeting was attended by, among others, Terri Cothron, Cigna's Manager of National Ancillary & Non-Par Management,

who was responsible for overseeing Cigna's contractual relationship with MultiPlan.

138.    In advance of that meeting, MultiPlan sent Cigna an email with an attached presentation titled, "2016 Network Development Meeting: A Client's Perspective on Out-of-Network Costs."  The presentation outlined how Cigna could redirect billions of dollars in out-of-network claims from providers to itself and MultiPlan.  During the meeting, MultiPlan explained how Viant and Data iSight worked and how they could significantly lower reimbursements paid to providers for out-of-network claims.

139.    After attending MultiPlan's presentation, Ms. Cothron confided to a co-worker that MultiPlan's Data iSight and Viant pricing methodology, "scares me."

140.    Nevertheless, Cigna contracted to use MultiPlan's pricing methodology for Cigna's out-of-network claims shortly thereafter.  Cigna used internal "Whitebook Reports" to keep track of how much money it earned by underpaying providers using MultiPlan's pricing methodology.  Those reports contain line items for each out-of-network claim and the corresponding amount of "savings" generated by using MultiPlan's pricing methodology.

141.    MultiPlan's communications with members of the Cartel shows how the price-fixing conspiracy unfolds in practice.  They show that MultiPlan discloses pricing levels among competitors, recommends that they adopt parallel pricing, and then implements that pricing on behalf of the Health Insurers.

142.    As it did with United, MultiPlan regularly shared competitive pricing data with Cigna.  During a deposition in an ERISA litigation, when asked whether there was "any information that MultiPlan would not provide for Cigna if Cigna asked," the Cigna witness responded: "from my experience, if I asked for information, they would provide it to me."

143. Upon information and belief, MultiPlan has engaged in similar communications with Horizon, as well as the other members of the Cartel.

> d. Defendants Use MultiPlan Tools As a Conduit to Exchange Competitive Pricing Information Despite Being Competitors

144. MultiPlan sends regular reports to competing Health Insurers about how little a healthcare provider is paid for out-of-network claims as a result of the Cartel's repricing. From these reports, Horizon (and Cartel members more broadly) can monitor how well co-conspirators are adhering to their agreement to cause healthcare providers to be underpaid for out-of-network claims.

145. In addition, MultiPlan recently increased its ability to exchange real-time pricing data and benchmarking information. In June 2023, it announced a new product in its Data and Decision Science solution suite: PlanOptix.

146. PlanOptix is marketed as a direct response to its Health Insurer-competitors' demands. The product enables "access" to 400 billion "fully indexed" records. For example, a Health Insurer can "search a CPT code and understand the price of that particular service . . . at a provider under a certain network." Health Insurers told MultiPlan that "[i]t's not enough to simply get to the data and information because the records are vast." They wanted direct competitor pricing information. MultiPlan obliged.

147. When MultiPlan first announced PlanOptix, it had already "ingested data on over 70 [Health Insurers]," including "all of the national major carriers as well as many of the regional ones."

148. At the Health Insurers' direction, MultiPlan enhanced PlanOptix to show competitor pricing data—"not just at a global level, but even at a service level right, labs and X-rays versus inpatient, inpatient versus outpatient." MultiPlan explained that, using PlanOptix,

40

Health Insurers would be able to answer questions such as: "Where do I sit versus my competitor?" and "How do I ensure that I'm negotiating correctly when I measure myself against my competitors?"

149. In other words, PlanOptix enables the members of the Cartel to monitor one another's adherence to their agreement to suppress out-of-network reimbursements by eliminating price competition on out-of-network claims. It does so by allowing Health Insurers to compare how much each competitor pays to a particular provider for a particular type of service.

150. At the November 28, 2023, Bank of America Leveraged Finance Conference, Mr. White stated that the purpose of PlanOptix is designed to "enable payers to benchmark themselves against their competitors."

    iv. *The Cartel Has a Motive to Collude*

151. Health Insurers, including Horizon, were motivated to conspire with MultiPlan to get the benefit of Ingenix-style price fixing, under the "cover" of using a third party. In an internal Cigna email, Cigna Chief Risk Officer Eva Borden explained that Cigna "cannot develop these charges internally (think of when Ingenix was sued for creating out-of-network reimbursements)." Rather, Cigna "need[ed] someone (external to Cigna) to develop acceptable" reimbursement rates. MultiPlan gladly, greedily, and anticompetitively complied.

152. In exchange for its role in the price fixing scheme, MultiPlan receives a percentage of the spread, *i.e.*, the underpayment to healthcare providers (ordinarily between 5-7 percent, but as much as 9.75 percent, of the "savings" obtained by MultiPlan). MultiPlan only makes money for its "repricing" and "data integrity" services if the Cartel is successful in suppressing out-of-network rates.

153. Similarly, Horizon and the other Health Insurers have an incentive to suppress payments to healthcare providers. For clients serving as administrators of self-funded plans, the

41

Health Insurers receive a "shared savings fee" or "processing fee" representing a percentage of the spread between the "billed amount" and the artificially suppressed "paid amount." For fully funded plans, the insurance company makes money by spending less than MultiPlan's fee and by pocketing the high premiums their members pay for the right to choose their doctor. The more that the Health Insurers collude to suppress claim payment amounts, the more they make. It is not uncommon for the Health Insurers, including Horizon, and MultiPlan to earn a "savings fee" that far exceeds the amount the provider receives for rendered care and treatment. By way of example, Cigna's own data shows that Cigna collected three times more in "savings" fees from the employees' claim payment funds than the providers received for rending care.[25]

Employer Paid:      $4,123,512
Provider Received:  $1,021,875
Cigna Received:     $3,101,637

| | BD | BE | BG | HR | HU | HV | HW |
|---|---|---|---|---|---|---|---|
| 1 | CHRG_AMT | ALLOWED_AMT | PAID_AMT | SUM_BILLED | SUM_ACCT_FEE_AMT | SUM_CST_CNTMT_SAV_AMT | SUM_VNDR_AN |
| 3046 | $2,481,927.00 | $996,325.66 | $875,809.76 | $ 11,020,546.00 | $ 2,524,898.98 | $ 7,177,507.39 | $ 677,943.68 |

| | BD | BE | BG | HR | HU | HV | HW |
|---|---|---|---|---|---|---|---|
| 1 | CHRG_AMT | ALLOWED_AMT | PAID_AMT | SUM_BILLED | SUM_ACCT_FEE_AMT | SUM_CST_CNTMT_SAV_AMT | SUM_VNDR_AMT |
| 579 | $524,694.89 | $100,400.30 | $94,409.69 | $ 1,369,662.00 | $ 243,044.39 | $ 708,977.54 | $ 56,510.77 |

| | BD | BE | BG | HR | HU | HV | HW |
|---|---|---|---|---|---|---|---|
| 1 | CHRG_AMT | ALLOWED_AMT | PAID_AMT | SUM_BILLED | SUM_ACCT_FEE_AMT | SUM_CST_CNTMT_SAV_AMT | SUM_VNDR_AN |
| 306 | $392,367.00 | $78,033.22 | $51,655.53 | $ 1,190,955.00 | $ 333,695.10 | $ 942,481.62 | $ 84,903.12 |

Such fees, by definition, are "unreasonable."

---

[25]      *TML Recovery, LLC v. Cigna Life & Health Ins. Co.*, 20-cv-00269 (DOC) (C.D. Cal.).

v. *The Health Insurers' Repricing Activities Only Make Sense if There Is Collusion*

154. A rational actor in a competitive market would not act against its own economic self-interest. Yet, the Health Insurers that joined the Cartel have engaged in actions that, without collusion, act against their self-interest in at least two ways.

155. First, competitors like the members of the Cartel would not agree to exchange large volumes of competitively sensitive pricing information in the absence of a Cartel-like agreement. Yet, the Health Insurers have agreed to exchange data regarding claims submitted by healthcare providers, reimbursement offers made by Health Insurers in response to those submitted claims, and the actual amount paid in response to those claims, and allow that information to be shared with their competitors knowing that, by so agreeing, they too would gain access to their competitors data.

156. In regular non-collusive relationships, Health Insurers jealously guard their pricing data as "business trade secrets." For example, a January 1, 2023, Administrative Services Agreement between Blue Cross and Blue Shield of Alabama and the City of Orange Beach prohibits disclosure of the Health Insurer's "Proprietary Data," including "valuable trade secret[s]" such as "UCR limits" and "negotiated provider payments."[26] A similar agreement between United and the Suwannee County School Board, effective May 1, 2023, prohibits disclosure of "Confidential Information," which includes "pricing, discounts, reimbursement terms, payment methodologies and payment processes, compensation arrangements, and any similar commercial

---

[26] Administrative Services Agreement between Blue Cross and Blue Shield of Alabama and City of Orange Beach art. IV(B)(4) https://www.orangebeachal.gov/AgendaCenter/ViewFile/Item/815?fileID=6572 (last visited Nov. 19, 2024).

43

information."[27]  Another agreement between Aetna and Webb County, effective January 1, 2017, prohibits disclosure of Aetna's "Business Confidential Information," including "rates, fees, [and] provider discount or payment information."[28]  Horizon has similar provisions in its agreements with clients and other contracting parties.

157.    The data exchanged is voluminous.  In December 2021, MultiPlan had access to "over 3 petabytes of structured claims data from across 700 payer customers."  By June 2023, MultiPlan touted that it had "10+ petabytes of [claims] data."  As discussed, MultiPlan uses this data to share confidential pricing information among members of the Cartel in order to fix prices.

158.    The information exchange operated by the Cartel mirrors an agreement to restrain trade.  *See, e.g.*, *United States v. U.S. Gypsum Co.*, 438 U.S. 422, 441 n.16 (1978) ("Exchanges of current price information, of course, have the greatest potential for generating anticompetitive effects."); *Todd v. Exxon Corp.*, 275 F.3d 191, 212 (2d Cir. 2001) (Sotomayor, J.) ("Price exchanges that identify particular parties, transactions, and prices are seen as potentially anticompetitive.").

159.    Second, such downward pressures on pricing should have had the effect of reducing Health Insurer members' access to out-of-network providers.  That does not appear to have happened.  The fact that it did not happen indicates collusion.  If a single Health Insurer entered into an agreement with MultiPlan to drastically underpay out-of-network claims, then healthcare

---

[27]    Administrative Services Agreement between United Healthcare Services, Inc. and Suwannee County School Board §§ 1, 7.2, https://digitalbell-bucket.s3.amazonaws.com/05017F03-5056-907D-8DE1-3CD69D226D7B.pdf (last visited Nov. 19, 2024).

[28]    Master Services Agreement between Aetna Life Insurance Company and Webb County § 9(A), https://agenda.webbcountytx.gov:8085/mindocs/2017/REG/20170626_724/149_Master%20Service%20Agreement%20-%20Aetna%20-%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%20%2335.pdf (last visited Nov. 19, 2024).

providers would simply refuse to treat insureds of that Health Insurer. As a result, the Health Insurer would face serious harm to the value and breadth of its insurance offering because out-of-network healthcare providers would refuse to provide treatment to plan participants, ultimately leading to a loss of customers for its insurance network. The collusion across the largest Health Insurers in the nation means that providers have no such course of action.

160. MultiPlan claims its tools are "a much better mechanism" for repricing claims "versus [Health Insurers] doing it themselves." As MultiPlan's President of New Markets, Paul Galant, put it: "[I]f a payer decides to do everything on their own, their ability to go back to providers and push for savings is fundamentally different than ours." MultiPlan acknowledges that, without industry coordination, an independent Health Insurer cannot single-handedly depress reimbursements to providers. But, through MultiPlan, which "can talk to the entire industry," all Health Insurers can agree to join the Cartel and eliminate the risk of individual conduct. As MultiPlan explained in an internal presentation to members of the Cartel: The Cartel's incentives are "completely aligned."

161. Accordingly, the Health Insurers that have joined the Cartel have refrained from engaging in self-interested conduct that would destabilize the Cartel. For example, MultiPlan's competitor-clients have abandoned efforts to in-source claims repricing activities despite the vast savings that such efforts would generate and, in at least one case, spending considerable sums developing an alternative claims repricing product.

162. As the nation's single largest commercial health insurance provider, United could analyze its own historical claims database to ascertain the most efficient pricing levels for out-of-network reimbursements. It could then reprice claims received from healthcare providers based upon that data. This would allow United to eliminate MultiPlan as a middle man, saving as much

45

as 9.75 percent on each repriced out-of-network claim, an amount equal to hundreds of millions of dollars per year.

163. In 2021, United created a product to do just that. It was known internally as Naviguard, which one analyst described as "an in-house replacement for MultiPlan." United developed a "roadmap" to terminate its contract with MultiPlan by 2023 in anticipation of Naviguard coming online. Instead of following through with Naviguard, however, United abandoned the project and instead recommitted to the Cartel in January 2023 when it renewed its contract with MultiPlan. This decision makes no economic sense absent a conspiracy.

164. By the same token, MultiPlan was willing to sacrifice short-term revenues and profits in order to stabilize the Cartel and to keep the largest Cartel members in the fold. As a result of MultiPlan's efforts to keep United in the Cartel by offering United discounted services, in the first quarter of 2023, MultiPlan experienced a 20.6 percent drop in revenues versus the first quarter of 2022 and a 30.7 percent drop in earnings before interest, taxes, depreciation, and amortization versus the first quarter of 2022.[29] MultiPlan's willingness, in the words of its CEO, to sacrifice "near-term financial impact" for its "long-term growth strategy," does not make economic sense absent its knowledge that United was important to the conspiracy.

vi. *The Health Insurance Market Presents High Barrier to Entry*

165. There are high barriers to entry into the health insurance market. New entrants must be able to bear the expenditures of time and money required to develop a robust network of healthcare providers large enough to compete as a commercial healthcare insurer. Even without

---

[29] In an apparent effort to sweeten the deal and keep United in the cartel, on June 27, 2023, MultiPlan announced that John Prince, the former President and Chief Operating Officer of Optum, UnitedHealth Group's health services subsidiary, would join MultiPlan's board of directors.

developing an insurance network, significant capital outlays are required to establish and to operate as a commercial healthcare payor. New entrants must also contend with the economies of scale and name recognition that incumbent Health Insurers possess.

166. There are also steep regulatory hurdles to market entry. The provision of health insurance is highly regulated and each state has its own varying regulations for the industry, leading to a patchwork system of licensing and compliance requirements that new entrants must navigate.

167. The repricing services themselves also present a high barrier to entry. To start a third-party repricing service, a new entrant would need to spend copious sums to develop source data and algorithms that effectively reprice out-of-network claims without infringing MultiPlan's patents, develop contractual relationships with the hundreds of commercial insurance networks, and commit significant resources to consistently improving its repricing algorithms and software. As a result, it is unlikely that any company could effectively disrupt the Health Insurer's repricing scheme.

168. These barriers to entry further solidify the dominance of the members of the Cartel by ensuring that any entity that tries to enter the market but rejects the Cartel's price-fixing scheme cannot undermine the Cartel members' ability to impose repriced reimbursement rates on healthcare providers for out-of-network services. These barriers to entry are further circumstantial support for the existence of the alleged conspiracy herein.

**F. Alternatively, the Cartel Constitutes a "Hub and Spoke" Conspiracy**

169. If the Cartel is found not to be a *per se* illegal "horizontal" price-fixing scheme between competitors, then the contract, combination, or conspiracy to unreasonably restrain trade and commerce as alleged herein would qualify as a "hub-and-spoke" scheme that is likewise *per se* illegal under the Sherman Act. When viewed under this lens, MultiPlan serves as the "hub" of

the conspiracy and the Health Insurers' agreements with MultiPlan to reprice their claims are the "spokes." The "rim" of the conspiracy is the tacit agreement between the Health Insurers to all use MultiPlan's repricing methodologies to suppress out-of-network reimbursement payments.

**G. Through Their Scheme, MultiPlan, Horizon, and the Other Health Insurers Illegally Restrained Compensation Rates for Advanced Spinal**

170. Through the Cartel, MultiPlan and the Health Insurers drive up the costs of healthcare to line their own pockets.

171. As discussed in Paragraph 11, medical healthcare costs are increasing nationwide and are projected to increase even more.[30] Horizon itself has represented publicly that "rising inflation continues to impact spending for the foreseeable future."[31] In fact, Horizon demanded of its largest client, the State of New Jersey's Employee Benefit Plan, a "24% increase for medical and a 3.7% increase for pharmacy benefits for active public workers, as well as a 15.6% increase in medical and a 26.1% increase in pharmacy benefits for public workers who retired before the age of 65."[32] Presumably, Horizon provided some type of historical analysis or projection to justify such a brazen request.

---

[30] *NHE Fact Sheet*, Ctrs. for Medicare & Medicaid Servs., https://www.cms.gov/Research-Statistics-Data-and-Systems/Statistics-Trends-and-Reports/NationalHealthExpendData/NHE-Fact-Sheet (last modified Feb. 17, 2023).

[31] *Hearing on Horizon Blue Cross Blue Shield Application to Reorganize into a Not-for-profit Mutual Holding Company System*, State of N.J. Dep't of Banking and Ins. (2022) (written Testimony of Jennifer Velez, Executive V.P. for Health and Network Solutions).

[32] Derek Hall, *N.J. public workers face big increase in health insurance rates in coming year*, NJ.Com (Jul. 23, 2022), https://www.nj.com/news/2022/07/nj-public-workers-face-big-increase-in-health-insurance-rates-in-coming-year.html.

172.    These price hikes are being passed down to patients.  In 2022, the New Jersey State Health Benefits Commission increased insurance premiums for public employees by 20 percent.[33] In July 2024, not long after Aetna joined Horizon as administrator of New Jersey's plans, the State recommended increasing premiums by an additional 17 percent on average.[34]

173.    Health Insurers are all increasing costs nationwide.  In Georgia, for example, the rates for Cigna's individual medical plans were set to increase by an average of 39.7 percent in 2024.  To justify this increase, Cigna blamed "the prices charged by doctors, hospitals, and other providers."[35]  In Delaware, Aetna recently requested a 34.53 percent rate hike for its Affordable Care Act ("ACA") Marketplace plans, before settling for an average increase of 11.7 percent, while United requested an 18.2 percent increase for its small-group plan.[36]  In Illinois, ACA Marketplace plans went up by an average of 10 percent in 2024, with some of the highest increases by Aetna (18 percent) and United (20 percent).[37]  In Elevance's case, the insurer reported an operating revenue increase of $1.5 billion compared to the prior year quarter that was "driven by higher

---

[33]    Katie Sobko, *NJ local government employees face soaring health costs. What's happening*, Bergen Rec. (Oct. 29, 2024, 1:36 PM), https://www.northjersey.com/story/news/new-jersey/2024/10/29/nj-local-government-health-benefit-costs-soar/75904285007/.

[34]    Nikita Biryukov, *Rate hikes loom for public health plan premiums*, N.J. Monitor (Aug. 27, 2024, 6:58 AM), )https://newjerseymonitor.com/2024/08/27/rate-hikes-loom-for-public-health-plan-premiums/.

[35]    *Written Description Justifying the Rate Increase*, Cigna, 1, https://www.cigna.com/static/www-cigna-com/docs/ifp/m-23-fly-ga-georgia-part-ii-rate-justification.pdf (last visited Nov. 19, 2024).

[36]    *Health Insurance Marketplace Data Released; Rates Finalized*, Del. News (Sept. 16, 2024), https://news.delaware.gov/2024/09/16/health-insurance-marketplace-data-released-rates-finalized/.

[37]    2024 Analysis of Illinois On-Exchange Plans, Ill. Dep't of Ins., 14, https://idoi.illinois.gov/content/dam/soi/en/web/insurance/companies/documents/2024-illinois-exchange-plan-analysis-eng.pdf (last visited Nov. 19, 2024).

premium yields . . . and premium rate increases . . . ."[38]

174. While Horizon demands more money from insured and self-funding employers, that money is not going to pay Advanced Spinal for its life-changing care for Horizon insureds. To the contrary, for the same services, under the same Plan terms, Horizon pays less, and less, and less. Advanced Spinal's annual reimbursement rates from Horizon have plummeted.

175. The scope of total underpayment to healthcare providers is staggering:

- In 2018, MultiPlan told investors that it identified "savings"—underpayments to healthcare providers—for its 700+ customers that totaled $15.6 billion;

- In 2019, MultiPlan reported "savings" of $19.1 billion;

- In 2020, it reported "savings" of $18.8 billion;

- In 2021, it reported "savings" of $21.7 billion;

- In 2022, it reported "savings" of $22.3 billion; and

- In 2023, it reported "savings" of $22.9 billion.

176. These numbers are the tip of the iceberg in showing how devastating this scheme has been for healthcare providers and to the healthcare industry.

177. As discussed, out-of-network healthcare providers cannot avoid the anticompetitive effects of the Cartel. Providers have no practical ability to reject the Cartel's take-it-or-leave-it terms and attempt to negotiate a better reimbursement rate. According to MultiPlan on their own website, 99.4 percent of all out-of-network claims for inpatient treatment that are repriced by Data iSight are accepted by healthcare providers. MultiPlan claims that as little as 2 percent of Data

---

[38] *Elevance Health Reports Third Quarter 2024 Results*, Elevance Health, 3, https://www.elevancehealth.com/content/dam/elevance-health/documents/earnings/3Q2024ELVEarningsRelease.pdf (last visited Nov. 19, 2024).

iSight's repricing recommendations are appealed for all claim types.[39]

178. In short, the Health Insurers' tactics, which are straight from the Cartel's playbook, have worked. Horizon, acting in concert with MultiPlan and the other Health Insurers, simply does not pay Advanced Spinal what it is owed.

179. Since 2018 and continuing through the present, Horizon has refused to pay or underpaid Advanced Spinal for medical services rendered to its insureds who had out-of-network benefits. Each of Horizon's claims at issue in this case corresponds to a particular CPT code billed to Horizon for services or supplies provided to Horizon insured.

180. In total, Advanced Spinal invoiced Horizon more than $182 million for the services rendered to Plan members, which is consistent with 80th Percentile FAIR Health for the services rendered. After taking into account co-insurance, cost-share and deductibles, Advanced Spinal was paid less than 13 percent of that amount. Horizon underpaid Advanced Spinal by nearly $160 million. Pursuant to the existing confidentiality order in this case, *see* ECF No. 29, Advanced Spinal will disclose the underlying claims data and identify the claims that were underpaid as a result of Defendants' participation in the Cartel's scheme.

## III. HORIZON BREACHED ITS ERISA FIDUCIARY OBLIGATIONS

### A. Horizon is an ERISA Fiduciary

181. Horizon serves as the named claims administrator for one or more of the Plans and has discretion over the payment of claims. As the designated claims administrator, Horizon acts as an "administrator" under ERISA. 29 U.S.C. § 1002(16)(A)(i). Horizon also offers fully insured Plans, which are funded by Horizon itself, not the sponsoring employers or other entities. For

---

[39] MultiPlan, *Tackling Out-of-Network Medical Bills With Data iSight*, (June 23, 2023), https://www.multiplan.us/tackling-out-of-network-medical-bills-with-data-isight/.

government-sponsored or church-sponsored Plans, which are not subject to ERISA, Horizon also acts as a fiduciary.

182.    ERISA provides that a "person" is a "fiduciary" with respect to a plan to the extent that "(i) he exercises any discretionary authority or discretionary control respecting management of such plan or exercises any authority or control respecting management or disposition of its assets, . . . or (iii) he has any discretionary authority or discretionary responsibility in the administration of such plan." 29 U.S.C. § 1002(21)(A). "Person" is defined broadly and encompasses corporations such as Horizon. *Id.* § 1002(9).

183.    Horizon qualifies as a fiduciary of its ERISA-covered Plans, *i.e.*, both those for which it serves as an administrator and those that it fully insures because, in both cases, Horizon exercises authority and/or control respecting management or disposition of the Plans' assets.

184.    ERISA requires that Horizon, as a fiduciary, must "discharge its duties with respect to a plan solely in the interest of the participants and beneficiaries," including Advanced Spinal, as assignees of Horizon insureds. 29 U.S.C. § 1104(a)(1)(A)(i). Fiduciary status under ERISA may exist even if the plan documents purport to disclaim that Horizon is a fiduciary.

185.    In performing services for its ERISA Plans, Horizon must not cause those Plans to engage in a transaction for which Horizon knows or should know constitutes a transfer to, or use by or for the benefit of, Horizon of the ERISA Plans' assets. 29 U.S.C. § 1106(a)(1)(D).

186.    As fiduciary of its Plans, Horizon must not "deal with the assets of the plan in [its] own interest or for [its] own account . . . ." 29 U.S.C. § 1106(b)(1).

187.    Horizon has been assigned discretionary authority, as administrator of its respective Plans, to perform an ERISA-required full and fair review of each claim denial that has been appealed by Advanced Spinal or an Advanced Spinal duly authorized representative. 29 U.S.C.

§ 1133(2). Accordingly, the ERISA regulations require that Horizon also provide, upon request and free of charge, reasonable access to, and copies of, all documents, records, and other information relevant to Advanced Spinal's individual claims for benefits. 29 C.F.R. § 2560-503.1(h)(2)(iii).

188. The applicable regulations require additional information be provided beyond the above information and provide that any review does not afford deference to any initial adverse benefit decision and is conducted by an appropriate named fiduciary who is neither the individual who made the adverse benefit decision that is the subject of the appeal nor the subordinate of such individual. 29 C.F.R. § 2560-503.1(h)(3).

### B. Horizon Refuses to Pay in Violation of ERISA

189. Horizon employed and continues to employ myriad strategies and tactics to avoid paying Advanced Spinal and other providers, including but not limited to:

- Forcing providers to re-submit otherwise completely proper claims;

- Reprocessing otherwise properly submitted claims;

- Falsely accusing providers of engaging in fraud or other misconduct to cut off any obligation to pay the provider and subject the provider to unjustified and pre-textual investigations by its Special Investigations Unit ("SIU") (never referring the matter to prosecuting authorities, which New Jersey law requires);

- Making agreements and promises to pay the provider but never, in fact, making payment;

- Paying claims outside the required ACH transfer protocol required by HIPAA, including sending hard copy cash redemption cards for each claim to providers that would require them to either manually enter the cash redemption card 16-digit ID number or pay the 2-4 percent transaction fee for using the card—which Advanced Spinal has come to learn would also net Horizon a 1-2 percent fee for the use of the cards;

- Forcing providers to engage in unjustified and baseless appeals and then failing to respond to the appeals;

53

- Converting appeals to "inquiries" to avoid federal and state notice and documentation requirements;

- Threatening to make a payment directly to the patient in an effort to extract a concession from the provider to accept a lower than required payment;

- Conjuring improper and unjustified problems with the claims submitted to justify either non-payment or reduced payment;

- Wrongfully processing claims by out-of-network providers as if they were claims submitted by in-network providers or wrongfully categorizing an entire out-of-network practice as an in-network practice, allowing Horizon to apply an improper "discount" to reduce the payment amount or to justify non-payment; and

- Falsely representing that Plans require Horizon to treat out-of-network providers as in-network providers.

190. Upon information and belief, Horizon's refusal to comply with applicable regulations, the Plans, and procedures governing the payment of claims, is institutionalized activity undertaken with the full knowledge and ratification of, and at the direction of, all levels of management of Horizon, including its officers and Board of Directors.

191. Each claim for non-payment or underpayment is being brought within six years after Advanced Spinal was notified by Horizon that it was rejecting or dramatically underpaying Advanced Spinal's claims for the services provided to Horizon insureds, or otherwise within six (6) years after each of Advanced Spinal's claims against Horizon accrued, after accounting for any tolling agreements.

      i. *Horizon Abuses the Repricing Process to Prevent Payments to Advanced Spinal*

192. As detailed above, Horizon engages "repricing" companies to coerce, harass, induce, and threaten Advanced Spinal's billing staff in order to delay payment until Advanced

Spinal relents and agrees to accept an amount well below the incurred amount.[40]  This repricing "negotiation" is a feature of the Cartel's anti-competitive conspiracy.

193.    Horizon will almost always process these repriced claims as if Advanced Spinal is an in-network provider and has already agreed to participate in its "negotiation" process[41]— another tactic commonly used by the Cartel.  *See, e.g.*, Paragraph 188.

194.    A recent example shows Horizon's arbitrary and capricious conduct and its use of repricing companies to attempt to extract concessions from Advanced Spinal independent of what Horizon is required to pay under the Plans.  In 2023, an Advanced Spinal surgeon performed a complex scoliosis reconstruction on Patient 1, a Horizon subscriber, in order to treat Patient 1's severe spinal deformity caused by scoliosis.[42]  As a result of the surgery, Patient 1's scoliosis curve was straightened, pain was eliminated, and Patient 1 could return to daily living and athletic activities with no restrictions.  For that surgery, on January 31, 2023, Advanced Spinal submitted a claim for $651,728.00 using CPT codes 2216, 22802, 22212, 20936, 22843, and 20930, consistent with the 80th percentile of FAIR Health.  Horizon accepted the claim and sent it to processing without any reservation.  Instead of receiving payment, on March 20, 2023, Advanced Spinal received a fax from John Howland, an employee of repricing company MARSs.  In the fax

---

[40]    Zelis is MultiPlan's main competitor.  As a testament to the success of the Cartel, according to a June 28, 2023, MultiPlan presentation, in 2022 MultiPlan processed around 546 million claims for repricing, while Zelis processed around 2 million.  Using these numbers as an estimate of market share, Zelis holds less than 0.4 percent of the market compared to MultiPlan's 99.6 percent market share.

[41]    Horizon will also process Advanced Spinal's claims as "in-network" claims in the 835 and deny or delay payment on the claim on that basis.  Representatives of Horizon have admitted this in recorded phone calls with Advanced Spinal's employees.

[42]    Because Patient 1's claim was settled and paid, this particular claim is not at issue in the Complaint and is included as an example of Horizon's practice of delaying and avoiding paying on its obligations.

transmittal letter and the attached "negotiation terms" sheet, Mr. Howland offered to pay Advanced Spinal a mere *$1,069.57 or 0.16 percent of the billed amount.* That offer was untethered to any benchmark or Plan language. Rather, Mr. Howland claimed that "MARS physicians" had "concerns" with the claim, including the lack of "clear evidence of extraordinary circumstances to explain the high charges."

195. In a response sent the same day, Advanced Spinal reminded MARS that Horizon had already accepted the claim under the applicable Plan. Advanced Spinal rejected MARS's offer but stated it was willing to accept a 15 percent discount. A day later on March 21, 2023, without addressing the merits of Advanced Spinal's response, Mr. Howland rejected Advanced Spinal's counteroffer and offered to pay $16,877.84 of the incurred amount. After rejecting Advanced Spinal's same-day counteroffer to discount the claim by 18 percent, Mr. Howland increased his offer to $30,000.00, claiming it was his "best" offer and the "absolute maximum" he was authorized to "allow." He further threatened that if Advanced Spinal did not accept this payment, he would "send the claim back to the payor for processing, with no guarantee of a set payment rate." *Id.* Mr. Howland provided no explanation under the Plan language for this offer. Advanced Spinal rejected this offer.

196. Over a month later on May 4, 2023, another employee of MARS, Mary Pacheco, sent a fax *restarting* the negotiation process and offered Advanced Spinal $64,640.90. MARS now claimed that some of the CPT Codes were "Non-Covered Charges," despite the fact that Horizon had already determined that the surgery was medically necessary, provided pre-authorization, and accepted the claim. After another round of back and forth, MARS finally offered to pay Advanced Spinal $355,000.00, which Ms. Pacheco claimed, like Mr. Howland, was the "best" offer, which if rejected, would restart the process. After multiple rounds of MARS's

and Horizon's coercive tactics and nearly four months after submitting the claim, Advanced Spinal settled for a nearly 50 percent discount. And still, it took Horizon several months to make any payment on the settlement, and perhaps, most incredibly, even that payment was not for the fully agreed upon settlement amount.

197. Advanced Spinal has been forced to engage in thousands of these negotiations despite the fact that Horizon routinely pre-authorizes treatments and accepts Advanced Spinal's claims when submitted for payment.

ii. *Horizon Wrongfully Engages in Pre-Payment Audits and Refers Advanced Spinal's Claims to Its "Special Investigations Unit" or "Special Investigations" Team*

198. In addition to improperly participating in the Cartel, which is itself a violation of their fiduciary duties, Horizon also initiated SIU pre-payment "audits," or pre-payment review generally, for purposes of delaying payment and coercing Advanced Spinal to accept severely reduced payments during the "negotiation" process with the repricing companies.

199. Horizon has substantially limited its payments, and in some instances stopped paying Advanced Spinal altogether, for the treatment and care of Horizon's patients. Almost every time Advanced Spinal submits a claim, Horizon's response is to send a letter requesting additional information. This exemplar from Horizon illustrative:

> Dear Provider (Facility Greeting) or Health Care Professional (Professional Greeting):
>
> Horizon Blue Cross Blue Shield of New Jersey received the above-noted claim on [date]. We need additional information before we can process this claim.
>
> **For tracking and timeliness, you must send a copy of this letter and the following documentation.** If the requested information is not received by **05-25-2023**, we will not consider the claim for payment.
> - Copies of Patient Intake forms
> - Daily Chart notes / Progress notes

- Laboratory testing results / requisition forms
- Diagnostic testing results
- Operative reports
- Anesthesia records
- Consultant records /reports
- Nursing notes

200. Horizon also engages third-party companies, like TurningPoint HealthCare Solutions, to send similar pre-payment audit requests. Often these requests demand a substantial amount of medical records and threaten to deny claims unless a response is provided within a limited timeframe, often 10 days. Horizon subjects providers, including Advanced Spinal, to these pre-payment audits even after Horizon has represented that no pre-authorization is required and even after Advanced Spinal sought and/or obtained pre-authorization (including medical record review) from Horizon.

201. For instance, in 2023, Advanced Spinal performed a total disc arthroplasty, a spinal procedure used to treat damaged and degenerated spinal discs, on Horizon subscriber Patient 2.[43] Horizon informed Advanced Spinal that no pre-authorization was required. For that surgery, on March 30, 2023, Advanced Spinal submitted a claim for $142,855.00, consistent with the 80th percentile of FAIR Health. On April 10, 2023, Horizon sent a letter demanding medical information before it would pay the claim. Advanced Spinal sent the requested medical information to Horizon within the period requested. To date, Horizon has only paid $2,688.60 on this claim.

202. Similarly, in 2023, Advanced Spinal performed surgery on Horizon subscriber Patient 3.[44] Prior to the procedure, Horizon represented to Advanced Spinal personnel that no pre-

---

[43] Patient 2's claim is detailed in Exhibit A at Control No. 780.

[44] Patient 3's claim is detailed in Exhibit A at Control No. 781.

authorization was required under Patient 3's Plan. For that surgery, on May 22, 2023, Advanced Spinal submitted a claim for $129,980.00, consistent with the 80th percentile of FAIR Health. Advanced Spinal relied upon Horizon's representation. Contrary to Horizon's representations, over a month later, Horizon sent a letter to Advanced Spinal demanding additional information from Advanced Spinal to "determine the eligibility of [the procedure]" and deferring payment of the claim. This is not an isolated instance. Horizon has repeatedly authorized procedures only to later delay or deny payment altogether.

203. Horizon also sends SIU letters to Advanced Spinal on claims that are subject to its "negotiation" process as a means to pressure and coerce Advanced Spinal to accept severely reduced payments. For instance, in 2022, an Advanced Spinal surgeon performed a spinal fusion surgery on Patient 4, a Horizon subscriber.[45] For that surgery, on December 23, 2022, Advanced Spinal submitted a claim for $170,584, which tracked the 80th percentile of FAIR Health for CPT codes 22551, 22845 59, 22853, 20930, and 20931. Horizon accepted the claim and sent it to processing without any reservation. Instead of receiving payment, on October 13, 2022, Advanced Spinal received a letter from a Horizon employee setting out the attached "negotiation terms" sheet. Horizon offered to pay Advanced Spinal a mere *$23,096.40 or 13 percent of the initial billed amount.* That offer was untethered to any benchmark or Plan language. After a series of back and forth with Horizon, the claim was then sent to MARS to continue the "negotiation" process. The claim was then transferred back to Horizon after Advanced Spinal rejected MARS's offer. Horizon responded by offering $17,751.00, *less than* its initial offer of $23,096.40. On phone calls with Advanced Spinal's employees, the Horizon representative argued, without any basis or reference to any Plan, that the claim was not covered. When confronted with the fact that

---

[45] Patient 4's claim is detailed in Exhibit A at Control No. 662.

Horizon incorrectly categorized the claim as in-network in the 835 record, Horizon's representative finally admitted that the claim was incorrectly processed as an in-network claim. Despite this, Horizon continued to refuse to pay Advanced Spinal what it was owed.

204. On January 7, 2023, after Advanced Spinal had again rejected Horizon's offer to pay a mere 10 percent of the billed amount, Horizon sent Advanced Spinal a letter from SIU, threatening to deny the claim for payment unless Advanced Spinal provided a voluminous amount of medical records when no preauthorization was required on the claim. Horizon's referral of Advanced Medical's claim to the SIU during the pendency of its coercive "negotiation" practice was an attempt to intimidate Advanced Spinal into accepting a grossly reduced amount on its claim. This is not an isolated instance, but a regular occurrence.

205. Horizon sent Advanced Spinal dozens and dozens of these pre-payment audit letters, far more than its meagerly staffed SIU could ever hope to process. Given the nature and frequency of the SIU letters that Advanced Spinal received, it seems unlikely, if not impossible, that Horizon is engaged in a manual review of these claims submitted. On information and belief, Advanced Spinal believes that the SIU letters and pre-payment review letters are being generated automatically.

       iii.    *Horizon's Payment of Claims Is Arbitrary and Unrelated to What Its Own Plans Require*

206. When Advanced Spinal engages on claim-specific discussions or claim-specific negotiations with Horizon or its representatives, the specific terms of the SPD or Horizon's payment obligations associated with those terms are never referenced or discussed. Instead, Horizon refuses to pay the amounts the underlying Plans require and makes payment decisions based on arbitrary and inapplicable standards.

207. For example, in 2022, Dr. Gatto operated on Patient 5, a Horizon subscriber.[46] For those services, Advanced Spinal submitted a claim for CPT codes 63047 and 63048 totaling $115,000.00, consistent with 80th percentile of FAIR Health. Despite accepting the claim for payment, Horizon has yet to make any payment.

208. Horizon has refused to pay Advanced Spinal for claims, citing Advanced Spinal's alleged failure to comply with the No Surprises Act. The No Surprises Act only applies to emergency and ambulance services and is thus inapplicable to the vast majority of Advanced Spinal's claims.

209. When Horizon does pay, its payment patterns are completely unjustified and wholly arbitrary. There is often no rhyme or reason to Horizon's payment calculations. Horizon's pattern of payment for the same procedure performed on patients on the same health benefits plan varies widely. For example, take CPT codes 63047 and 63048:

| Patient[47] | Date of Service | Amount Billed | Amount Paid | Percent Paid | CPT |
|---|---|---|---|---|---|
| Patient 6 | 2020 | $202,500 | $10,187.56 | 5 | 63047, 63048 |
| Patient 7 | 2019 | $202,500 | $3,504.17 | 2 | 63047, 63048 |

---

[46] Patient 5's claim is detailed in Exhibit A at Control No. 599.

[47] Because Patients 6 and 7's claims were settled, these particular claims are not at issue in the Complaint and are included as examples of Horizon's inconsistent payment patterns.

Similarly, for CPT codes 20930, 22558, 22845, and 22853, for example:

| Patient[48] | Date of Service | Amount Billed | Amount Paid | Percent Paid | CPT |
|---|---|---|---|---|---|
| Patient 8 | 2020 | $152,815 | $1,658.50 | 1 | 20930, 22558, 22845, 22853 |
| Patient 9 | 2020 | $152,815 | $60,187.50 | 39 | 20930, 22558, 22845, 22853 |

### C. Horizon's Actions Have Rendered the Appeals Process a Farce

210. Horizon has procedures for administrative appeal of claim adjudication. After receiving rejections and/or offers to pay substantially below the charged amount, Advanced Spinal exhausted the available appeals or such appeals have been rendered futile given Horizon's refusal to process appeals consistent with 29 C.F.R. § 2560.503-1. Advanced Spinal filed internal appeals, with the result being that Horizon adheres to its initial decision or, more commonly, mischaracterizes the appeal as an "inquiry" and punts the matter to a repricing company.

211. Since 2018, Advanced Spinal has initiated appeals on the at-issue claims. By significantly underpaying Advanced Spinal's claims, Horizon forces Advanced Spinal to engage in an appeals process. Horizon has largely rejected Advanced Spinal's appeals, affirming its original adjudication or making a nominally higher additional payment. This is by design. As the appeals serve as a pre-textual basis for delaying and denying payment on otherwise valid claims.

212. Horizon refuses to provide any meaningful response to these appeals or, in many cases, simply reaffirms its initial reimbursement without explanation. Even if Advanced Spinal

---

48 Patient 8 and Patient 9's claims are detailed in Exhibit A at Control Nos. 211 and 283, respectively.

reaches an agreement with Horizon, Horizon often fails to pay the amount demanded on appeal. It is futile for Advanced Spinal to continue to seek internal or external appeals with Horizon for any further claims payments.

213.    Often after Advanced Spinal has initiated an appeal, Horizon will freeze the appeal until a "signed member authorization" is received.  Even after Advanced Spinal provides a member authorization, Horizon will often reject the authorization claiming it is "not valid for the member's Home Plan."

214.    For some claims, Horizon also send appeals to members' "Home Plans" for review and advise Advanced Spinal to "contact the member" directly if no response is provided from the member's Home Plan within a certain period of time.

215.    To the extent some of the claims at issue are covered by non-ERISA Plans, Advanced Spinal has likewise completed the internal appeals.  Horizon, however, simply affirms its initial decisions or pays slightly higher amounts, providing little or no analysis, and leaving the claims still grossly underpaid.  Accordingly, any additional attempts to appeal Horizon's claims would be futile.

216.    Because seeking appeals results in little to no adjustment to the initial payment, and because Horizon refuses to provide any meaningful response to Advanced Spinal's appeals, or in most cases, simply reaffirms its initial payment amount without explanation, it would be futile for Advanced Spinal to continue to seek internal or external appeals with Horizon.

217.    Moreover, Horizon has failed to follow the notice and appeal requirement that it explains is the basis for its dramatic underpayments to Advanced Spinal.  *See* 29 C.F.R. § 2560.503-1(g).  In particular, Horizon has issued adverse benefit determinations as defined under 29 C.F.R. § 2560.503-1(m) for Horizon's claims and has failed or refused to: (a) provide the

63

reasons for the denial of claims; (b) provide the specific Plan provisions relied upon to support the denials; (c) provide the specific rule, guideline or protocol relied upon in making the decision to deny claims; (d) describe any additional material or information necessary to perfect a claim, such as the appropriate diagnosis/treatment code; and (e) notify the relevant parties that they are entitled to have, free of charge, all documents, records and other information relevant to the claims.

218.    Exhaustion is therefore futile pursuant to 29 C.F.R. § 2560.503-1(l) because Horizon has failed to follow the minimum standards required under ERISA and its regulations.

219.    In addition, in its appeals to Horizon for the at-issue claims, Advanced Spinal has requested the following information related to each denial and underpayment: (a) all contracts detailing any and all contractual obligations with Horizon; (b) Plan documents specifically identifying a "Legislative Fee" schedule; (c) the identity of the "Originating Payer" [the Plan]; (d) the "reassociation" and trace information associated with the claim from the Plan; (e) Plan documents specifically identifying the adjustment reason utilized in the EOB; (f) Horizon's definition and/or explanation of all standardized Claim Adjustment Reason Code utilized in its ERA; (g) the identity of the "Plan" [Tax ID #] and its Originating Depository Financial Institution ("ODFI") information; (h) the HIPAA required Electronic Data Interchange policy and procedures; (i) the claims processing manual which identifies the provider requirements for submission if different than HIPAA standards; (j) all adjustments codes utilized if the standardized "CARC," "RARC" and Group Codes are not used; and (k) all anti-assignment provisions consistent with State and Federal regulations.  Horizon has refused to provide the above requested information in violation of 29 U.S.C. § 1133(2) and 29 C.F.R. §§ 2560.503-1(h), (m)(8).

220.    Exhaustion is therefore futile pursuant to 29 C.F.R. § 2560.503-1 because Horizon has failed to provide the requested documents necessary for Advanced Spinal to evaluate the claim

denials and otherwise failed to follow the minimum standards required under ERISA and its regulations. Horizon has thus offered no meaningful administrative process for challenging its underpayment and denial of claims.

### D. Horizon Waived the Applicability of Any Anti-Assignment Clause

221. It is also Advanced Spinal's practice to obtain from the patient an assignment of benefits. Through this assignment, Advanced Spinal obtains the right to seek reimbursement or payment from an insurer for covered services provided to the patient. Advanced Spinal has obtained an assignment for its respective at-issue claims. As part of the pre-approval process, Horizon acknowledges that Advanced Spinal has a valid assignment of benefits.

222. The assignment of benefits signed by each patient reads as follows:

**PATIENT FINANCIAL RESPONSIBILITY, CONSENT &**
**ASSIGNMENT OF BENEFITS FORM**
**Assignment of Benefits/Consent to Treat**

I hereby give my authorization to treat and assign all medical and surgical benefits, to include major medical benefits to which I am entitled, to The Advanced Spine Center, including but not limited to, my right to appeal and sue for reimbursement and benefits. I hereby authorize and direct my insurance carrier(s), including Medicare, private insurance and any other health/medical plan, to issue payment check(s) directly to The Advanced Spine Center for medical services rendered to myself and/or my dependents regardless of my insurance benefits, if any. I understand that I am responsible for any amount not covered by insurance. I understand and agree that should my insurance carrier(s), including Medicare, private insurance and any other health/medical plan, issue payment direct to me instead of The Advanced Spine Center, all such payments shall be expressly held in trust by me for the benefit of The Advanced Spine Center; and I shall immediately endorse and tender said payment over to The Advanced Spine Center.

65

I hereby assign my rights, title and interest under the medical expense section and/or PIP section of my insurance policy to The Advanced Spine Center to bring a lawsuit or arbitration against my insurance carrier(s). This allows The Advanced Spine Center to retain an attorney of their choice to filing litigation or arbitration for any unpaid medical expenses, and/or denied proposed medical treatment, against my insurance carrier, or any other company, against which I may proceed for medical expense benefits. Unless revoked, this assignment is valid for all administrative and judicial reviews under the Patient Protection and Affordable Care Act, ERISA, Medicare and applicable federal or state laws. A photocopy of this assignment is to be considered as valid as the original.

223. On information and belief, the Plans do not prohibit Horizon insureds from assigning their Plan benefits to Advanced Spinal. Indeed, most expressly permit Horizon insureds to assign their benefits to health care providers; others are silent on the issue. *See N. Jersey Brain & Spine Ctr. v. Aetna, Inc.*, 801 F.3d 369, 372–73 (3d Cir. 2015) ("We hold that as a matter of federal common law, when a patient assigns payment of insurance benefits to a healthcare provider, that provider gains standing to sue for that payment under ERISA § 502(a). An assignment of the right to payment logically entails the right to sue for non-payment."). Plans that prohibit assigning benefits or the right to benefits under any plan administered by Horizon to any third party are the exception and not the rule.

224. If a Plan has an anti-assignment clause or provision, then that clause or provision appears in a Plan's SPD.

225. Horizon can waive the applicability of any anti-assignment clause that a plan document may impose through their conduct or omissions.

226. Horizon, through its conduct and through the conduct of its agents, waived the applicability of, and/or is estopped from enforcing, any anti-assignment clause to prevent, interfere, or otherwise obstruct the payment of any claim directly to Advanced Spinal. Horizon and its agents have done so through verbal representations, written representations, and conduct.

66

227. The purpose of the anti-assignment clause has nothing to do with payment of providers who care for, treat, or cure Horizon insureds. Its purpose is to prevent Horizon insureds from sharing their health insurance card with non-insured or under-insured people to obtain coverage for care or treatment. Horizon has intentionally misinterpreted this restriction to interfere with the obligation to pay for properly rendered medical services.

228. Horizon has waived its right to invoke, or alternatively, are estopped from invoking, any anti-assignment clause for the following reasons:

- Horizon acknowledged before patients were treated that the patients had insurance coverage through Horizon and identified the maximum amount of patient out-of-pocket responsibility for each service;

- When Horizon accepted the original HCFA or 837 EDI transaction, it was identified as being submitted for payment pursuant to an assignment. Horizon never rejected an HCFA or 837 EDI transaction for any claim at issue on the basis that it was submitted pursuant to an improper "assignment";

- In the last six years, Horizon has never rejected any Advanced Spinal claim, including those at issue, on anti-assignment grounds;

- On information and belief, and discovery will confirm, Horizon identifies each relevant claim or claim line as being a claim submitted pursuant to a proper assignment. Such treatment would be consistent with the manner in which other large health insurance companies track claim-specific data internally. Horizon has never rejected any Advanced Spinal claim at issue on the grounds that it was subject to an anti-assignment clause;

- On information and belief, and discovery will confirm, Horizon transmits medical claims information to NASCO for adjudication purposes. In other words, Horizon does not adjudicate the claims submitted to it, but delegates that responsibility to NASCO, a wholly owned subsidiary of Blue Cross Blue Shield of Michigan. On information and belief, the medical claims information that Horizon transmits to NASCO for adjudication includes a claim field reading that each claim was submitted for payment pursuant to a proper assignment of benefits;

- Horizon does not track, nor does it have the ability to track for purposes of claims adjudication, whether a claim submitted relates to a Plan that may have an anti-assignment clause in its SPD;

67

- Neither Horizon nor NASCO refers to any particular Plan's SPD when adjudicating claims, much less any specific clause or section;

- On information and belief, and discovery will confirm, neither Horizon's nor NASCO's claims adjudication rules or claim processing rules for the largest Plans contain descriptions or notations that the Plans are subject to an anti-assignment clause;

- For the past six years, Horizon has regularly made payments directly to Advanced Spinal, whether the patient was in a Plan with an anti-assignment provision in the Plan's SPD or not;

- Horizon has an affirmative, regulatory obligation to notify Advanced Spinal of *all* grounds for adjustment or non-payment. When generating 835s or Electronic Remittance Advice to return to Advanced Spinal in connection with each claim, Horizon has never included a comment, statement, or justification that the claim was accepted, adjusted, or paid less than the charged amount as a result of a Plan-specific anti-assignment clause;

- As discussed at Paragraphs 210–20, Advanced Spinal has engaged in countless appeals, inquiries, and negotiations regarding the claims at issue. No appeal, inquiry, or negotiation has been rejected by Horizon or by any repricing company acting on its behalf as a result of an anti-assignment clause in any Plan;

- Further, in connection with any specific appeal, inquiry, or negotiation, no representative of Horizon, or agent of Horizon working for the repricing companies, has ever invoked the anti-assignment clause as a justification for the resolution of or position regarding any claim-specific appeal, inquiry, or negotiation. To the contrary, in innumerable hours of recordings of these negotiations, Horizon's employees or the employees of the repricing companies acting on Horizon's behalf, always freely admit that they do not have before them and have never reviewed the SPD of the Plan to which the claim may pertain. Many case representatives even admit that they do not know what an SPD is; and

- Horizon never responded to Advanced Spinal's claims rejecting the claims as being in violation of the anti-assignment provision of any Plan, but instead by (a) initiating a Special Investigations Unit inquiry before any claim was paid, (b) requesting additional information related to the claim, including a request for patient medical records, or (c) trigging some other type of pre-payment review or condition.

229. Advanced Spinal is not aware of a single claim at issue that Horizon rejected because of an anti-assignment clause.

68

**E.     HIPAA Requires Horizon to Deal with and Pay Advanced Spinal Irrespective of Any Anti-Assignment Provision**

230.    HIPAA governs transactions among health plans, health insurers, and providers. The applicable statutes and regulations cannot be avoided or abrogated by agreement—including a provision in a health plan being invoked for reasons other than its intended purpose—to avoid a payment obligation.

231.    Horizon has represented to licensing bodies and regulatory agencies that it complies with all applicable HIPAA regulations.

232.    Horizon has represented and warranted in agreements with its insureds that it will comply with all HIPAA regulations.

233.    The HIPAA regulations *require* Horizon to pay Advanced Spinal independent of any potentially applicable anti-assignment clause.

234.    HIPAA, as augmented by the Affordable Care Act and supporting regulations, requires health care transactions to be conducted in a certain manner and requires certain standard EDI transactions of all participants in the health care ecosystem.  42 U.S.C. § 1320d-1(a).  This "Administrative Simplification" is mandatory.   The EDI data sets are known as "standard transactions."  45 C.F.R. § 162.103

235.    The regulation provides that "[i]f an entity requests a health plan to conduct a transaction as a standard transaction, *the health plan must do so*."  45 C.F.R. § 162.925(a)(1) (emphasis added).  In addition, health plans must "[a]ccept *and promptly process* any standard transaction that contains codes that are valid, as provided in subpart J of this part."  *Id*. § 162.925(c)(1) (emphasis added); *see id.* § 162.923(a) ("[I]f a covered entity conducts, with another covered entity that is required to comply with a transaction standard adopted under this part (or within the same covered entity), using electronic media . . . the covered entity must conduct the

69

transaction as a standard transaction.").

236.     Under this regulation, Horizon is a "health plan." "Health plan means an individual or group plan that provides, or pays the cost of, medical care (as defined in section 2791(2) of the PHS Act, 42 U.S.C. 300gg-91(a)(2))." That includes "health insurance issuer." 45 C.F.R. § 160.103 (defining "health plan). A health insurance issuer "means an insurance company, insurance service, or insurance organization (including an HMO) that is licensed to engage in the business of insurance in a State and is subject to State law that regulates insurance." *Id.* Horizon is an "insurance company." And Horizon is licensed to engage in the business of insurance in the State of New Jersey.

237.     Advanced Spinal is a "covered entity." *See* 45 C.F.R. § 160.103 (defining "covered entities" to include "health care providers," which includes "a provider of medical or health services . . . and any other person or organization who furnishes, bills, or is paid for health care in the normal course of business.").

238.     A request for payment by submission of an 837 is a request to "conduct a transaction as a standard transaction." 45 C.F.R. § 162.925(a)(1). It is a "transaction," defined as "the transmission of information between two parties to carry out financial or administrative activities related to health care. It includes the following types of information transmissions: (1) Health care claims or equivalent encounter information. *(2) Health care payment and remittance advice* . . . (4) Health care claim status . . . (10) Health claims attachments. *(11) Health care electronic funds transfers (EFT) and remittance advice.*" 45 C.F.R. § 160.103 (emphases added).

239.     The transmission of a request for payment/remittance advice in the form of an 837 is a "standard transaction." A "standard transaction" is "a transaction that complies with an applicable standard and associated operating rules adopted under this part [Part 162 –

Administrative Requirements]." 45 C.F.R. § 162.103. Compliance with the applicable standard and operating rules are mandatory for "covered entities," which includes health plans like Horizon. 45 C.F.R. § 162.100 ("Covered entities (as defined in § 160.103 of this subchapter) *must comply with the applicable requirements of this part*.") (emphasis added)). Pursuant to 45 C.F.R. § 162.1101, the "health care claims or equivalent encounter information transaction is the transmission of either of the following: (a) *A request to obtain payment, and the necessary accompanying information from a health care provider to a health plan, for health care*…." 45 C.F.R. § 162.1101(a) (emphasis added). The standard for a request for payment submitted by a health care provider providing professional health care claims after January 1, 2012, is defined, by regulation, as the "ASC X12 Standards for Electronic Data Interchange Technical Report Type 3 - Health Care Claim: Professional (837), May 2006, ASC X12N/005010X222. 45 C.F.R. § 162.1102(b)(2)(iii), (c); *see id*. § 162.920.

240. Anti-assignment provision or not, Horizon has to accept and process a claim for payment submitted pursuant to the 837. Horizon has done so for all of the claims at issue because, for each, Horizon transmitted a corresponding and responsive 835. *See* 45 C.F.R. § 162.1602 (Standards for health care electronic funds transfers (EFT) and remittance advice transaction – requiring use of "the ASC X12 Standards for Electronic Data Interchange Technical Report Type 3, Health Care Claim Payment/Advice (835), April 2006, ASC X12N/005010X221."). In short, because the regulatory framework requires Horizon to accept and process transactions submitted by out-of-network doctors, including to make payments on properly submitted claims, Horizon cannot rely on an anti-assignment clause to avoid that legal obligation.

## CLAIM I

### CONSPIRACY/COMBINATION IN RESTRAINT OF TRADE
### *PER SE* VIOLATION (15 U.S.C. § 1)
### (ASSERTED AGAINST ALL DEFENDANTS)

241.     The foregoing allegations are re-alleged and incorporated by reference as if fully set forth herein.

242.     Advanced Spinal seeks monetary and injunctive relief under Section 4 of the Clayton Antitrust Act for Defendants' conduct in violation of Section 1 of the Sherman Act.

243.     Beginning no later than July 1, 2017, Defendants formed and engaged in a continuing contract, combination, or conspiracy to unreasonably restrain interstate trade and commerce in violation of Section 1 of the Sherman Antitrust Act, 15 U.S.C. § 1.

244.     The contract, combination, or conspiracy alleged herein has consisted of a continuing agreement among Defendants and others to knowingly and collectively use MultiPlan's repricing tool to set reimbursement rates for out-of-network healthcare services.  This conspiracy has caused Advanced Spinal to receive artificially suppressed reimbursements for out-of-network healthcare services.

245.     The contract, combination, or conspiracy alleged herein has taken the form of a horizontal conspiracy between competitors, the Health Insurers and Horizon, and a potential competitor, MultiPlan, in the commercial health insurance market in the United States

246.     In the alternative, the contract, combination, or conspiracy alleged herein has taken the form of a horizontal conspiracy between competitors in the United States' commercial health insurance market.

247.     In furtherance of this contract, combination, or conspiracy, Defendants have committed various acts, including the acts alleged above as well as:

72

i. Horizon, in concert with other Health Insurers not named in this action, provided real-time, private, confidential, and detailed internal claims data to MultiPlan for use in MultiPlan's out-of-network claim repricing tool;

ii. MultiPlan sold and operated its out-of-network claim repricing tool that repriced the reimbursement rate for out-of-network healthcare services claims;

iii. Horizon knowingly used the same out-of-network claim repricing tool that incorporated other Health Insurers' real-time, private, confidential, and detailed internal claims data to calculate reimbursement rates for out-of-network healthcare services claims;

iv. Horizon paid reimbursements for out-of-network healthcare services claims at the rates recommended by MultiPlan's repricing tool;

v. Horizon outsourced out-of-network claims handling to MultiPlan knowing that MultiPlan would set the reimbursement rate of out-of-network healthcare claims at the rates recommended by its repricing tool;

vi. Defendants exchanged sensitive, real-time, private, confidential, and detailed internal claims data with each other and other Health Insurers, including by using the MultiPlan out-of-network claims repricing tool; and

vii. Defendants used many forms and methods of bilateral and multilateral communication across various settings and venues concerning the reimbursement rate for out-of-network healthcare services claims, including their use of MultiPlan's out-of-network claim repricing tool, which had the purpose and effect of maintaining and reinforcing their anticompetitive

73

scheme.

248. Defendants possess market power in the relevant antitrust market, as alleged herein: The relevant product market is reimbursements of out-of-network healthcare services claims by commercial payors, and the relevant geographic market is the United States.

249. Defendants' contract, combination, or conspiracy has led to anticompetitive effects in the form of artificially suppressed reimbursement rates for out-of-network healthcare services claims that fall below the traditional and competitive rates for such claims.

250. As a direct and proximate result of Defendants' past and continuing violation of Section 1 of the Sherman Antitrust Act, Advanced Spinal has been injured in its business and property and will continue to be injured in its business and property by receiving reimbursements for out-of-network healthcare services claims that are lower than what it would have received absent Defendants' conspiracy, and is entitled to damages in amounts to be proven at trial.

251. Defendants' conspiracy is a *per se* violation of Section 1 of the Sherman Antitrust Act.

## CLAIM II

### CONSPIRACY/COMBINATION IN RESTRAINT OF TRADE
### QUICK LOOK OR RULE OF REASON (15 U.S.C. § 1)
### (ASSERTED AGAINST ALL DEFENDANTS)

252. The foregoing allegations are re-alleged and incorporated by reference as if fully set forth herein.

253. The contract, combination, or conspiracy to unreasonably restrain trade and commerce as alleged herein has taken the form of a hub-and-spoke conspiracy in which MultiPlan served as the hub, the agreements between MultiPlan and the Health Insurers, including Horizon, to use MultiPlan's claim repricing tool served as the spokes, and the agreement between Horizon

74

and MultiPlan to use MultiPlan's repricing tool to reprice reimbursement rates for out-of-network healthcare services served as the rim. This conduct violates Section 1 of the Sherman Antitrust Act.

254. Advanced Spinal seeks monetary and injunctive relief under Section 4 of the Clayton Antitrust Act for this violation.

255. The contract, combination, or conspiracy alleged herein has consisted of a continuing agreement among Defendants to knowingly and collectively use MultiPlan's repricing tool. This conspiracy has caused Advanced Spinal to receive artificially suppressed reimbursements on claims for out-of-network healthcare services.

256. To further this contract, combination, or conspiracy, Defendants committed various acts, including the acts alleged above as well as:

    i.    Horizon, in concert with other Health Insurers not named in this action, provided real-time, private, confidential, and detailed internal claims data to MultiPlan for use in MultiPlan's out-of-network claim repricing tool;

    ii.    MultiPlan sold and operated its out-of-network claim repricing tool that repriced the reimbursement rate for out-of-network healthcare services claims;

    iii.    Horizon knowingly used the same out-of-network claim repricing tool that incorporated other Health Insurers' real-time, private, confidential, and detailed internal claims data to calculate reimbursement rates for out-of-network healthcare services claims;

    iv.    Horizon paid reimbursements for out-of-network healthcare services claims at the rates recommended by MultiPlan's repricing tool;

v.       Horizon outsourced out-of-network claims handling to MultiPlan knowing that MultiPlan would set the reimbursement rate of out-of-network healthcare claims at the rates recommended by its repricing tool;

vi.      Defendants exchanged sensitive, real-time, private, confidential, and detailed internal claims data with each other, including by using the MultiPlan out-of-network claims repricing tool; and

vii.     Defendants used many forms and methods of bilateral and multilateral communication across various settings and venues concerning the reimbursement rate for out-of-network healthcare services claims, including their use of MultiPlan's out-of-network claim repricing tool, which had the purpose and effect of maintaining and reinforcing their anticompetitive scheme.

257.    Defendants possess market power in the relevant antitrust market, as alleged herein: The relevant product market is reimbursements of out-of-network healthcare services claims by commercial payors, and the relevant geographic market is the United States.

258.    Defendants' contract, combination, or conspiracy has led to anticompetitive effects in the form of artificially suppressed reimbursement rates for out-of-network healthcare services claims that fall below the traditional and competitive rates for such claims.

259.    As a direct and proximate result of Defendants' past and continuing violation of Section 1 of the Sherman Antitrust Act, Advanced Spinal has been injured in its business and property and will continue to be injured in its business and property by receiving reimbursements for out-of-network healthcare services claims that are lower than what it would have received absent Defendants' conspiracy, and is entitled to damages in amounts to be proven at trial.

76

260. There are no procompetitive justifications for Defendants' conspiracy, and any proffered procompetitive justifications, to the extent any exist, could have been achieved through less restrictive means.

261. Defendants' conspiracy violates Section 1 of the Sherman Antitrust Act under either a quick-look or rule-of-reason analysis.

## CLAIM III

### MONOPOLIZATION (15 U.S.C. § 2)
### (ASSERTED AGAINST MULTIPLAN)

262. The foregoing allegations are re-alleged and incorporated by reference as if fully set forth herein.

263. As alleged herein, from at least July 1, 2017, to the present, MultiPlan possessed monopoly power in the market for commercial health insurance repricing. No other competitor has been able to restrain MultiPlan's ability to dominate this market during the relevant time period. MultiPlan had and has the ability to control commercial health insurance repricing and exclude competitors.

264. MultiPlan willfully and unlawfully maintained its market power in the commercial health insurance repricing market by engaging in an anticompetitive scheme to prevent legitimate competition on the merits. MultiPlan's monopoly has been maintained by its anticompetitive misconduct and not as a result of providing a superior product, business acumen, or historical accident.

265. MutliPlan's course of anticompetitive misconduct, as alleged herein, required Health Insurers and Horizon to use MultiPlan's repricing tool exclusively or effectively exclusively. MultiPlan has substantially foreclosed the market from actual and potential competition.

77

266. There are no valid procompetitive justifications for MultiPlan's exclusionary conduct in the commercial health insurance repricing market. Even if there were (and there are not), any such ostensible procompetitive benefit could have been obtained through a less restrictive means.

267. As a result of this scheme, Advanced Spinal received artificially suppressed reimbursements for the healthcare services it provided to Horizon insureds. Advanced Spinal has been injured by MultiPlan's antitrust violations, and is entitled to damages in amounts to be proven at trial. Such injury is of the type the antitrust laws were designed to prevent and flows from that which makes MultiPlan's misconduct unlawful.

268. Advanced Spinal is the proper entity to bring a private case concerning this conduct. The direct purchasers of MultiPlan's repricing services—Health Insurers and Horizon—are all subject to MultiPlan's control with respect to out-of-network claims repricing, are MultiPlan's co-conspirators, and benefit from the scheme.

269. MultiPlan's anticompetitive acts violate Section 2 of the Sherman Antitrust Act.

### CLAIM IV

### CONSPIRACY TO MONOPOLIZE (15 U.S.C. § 2)
### (ASSERTED AGAINST ALL DEFENDANTS)

270. The foregoing allegations are re-alleged and incorporated by reference as if fully set forth herein.

271. As alleged herein, from at least July 1, 2017, to the present, MultiPlan possessed monopoly power in the market for commercial health insurance repricing. No other competitor has been able to restrain MultiPlan's ability to dominate this market during the relevant time period. MultiPlan had and has the ability to control commercial health insurance repricing and excludes competitors.

272. Defendants and other Health Insurers conspired to unlawfully maintain MultiPlan's monopoly. In return for their participation in the conspiracy, Defendants and other Health Insurer co-conspirators received a share of the difference between what amount a healthcare provider submitted and what was ultimately paid.

273. The goal, purpose, and effect of the MultiPlan-directed conspiracy was to maintain and extend MultiPlan's monopoly over the commercial health insurance repricing market so as to ensure continued monopoly profits and control.

274. As a direct and proximate result of the conspiracy to monopolize, Advanced Spinal received artificially suppressed reimbursements for the healthcare services it provided and was harmed as a result and is entitled to damages in amounts to be proven at trial. These injuries are of the type the Sherman Antitrust Act was designed to prevent, and flow from that which makes MultiPlan's misconduct unlawful.

275. By engaging in the foregoing misconduct, Defendants have intentionally and wrongfully conspired to monopolize in violation of the Sherman Antitrust Act.

276. But for Defendants' unlawful conspiracy to monopolize, Advanced Spinal would have received more fair reimbursements for the healthcare services it provides.

**CLAIM V**

**BENEFITS DUE UNDER ERISA § 502(A)(1)(B)**
**(ASSERTED AGAINST HORIZON)**
**(NON-GOVERNMENT AND NON-CHURCH SPONSORED PLANS)**

277. Advanced Spinal repeats and incorporates by reference all preceding paragraphs and allegations.

278. Advanced Spinal provided services to Horizon insureds for the claims at issue in this lawsuit.

279. Advanced Spinal has an assignment of benefits from each patient for each claim at issue. As an assignee, Advanced Spinal has standing to pursue payment for the medical services provided to Horizon insureds.

280. Horizon did not prohibit its Plan members from assigning their rights to benefits to Advanced Spinal, including the right of direct payment of benefits. To the extent that Horizon purports to prohibit the assignment of benefits to Advanced Spinal, Horizon waived any anti-assignment provisions, ratified the assignment of benefits, and waived or is estopped from using any anti-assignment provisions against Advanced Spinal due to Horizon's course of dealing with and representations to Advanced Spinal.

281. Advanced Spinal's unrecovered charges are consistent with 80th percentile of the FAIR Health benchmark.

282. Advanced Spinal's charges for treatments provided should have been paid in full.

283. At all relevant times, Advanced Spinal was an out-of-network provider.

284. Each of the services were medically necessary and covered by the Plans.

## CLAIM VI

### BREACH OF FIDUCIARY DUTIES UNDER ERISA §§ 1104(A), 1109(A) & 1132(A)(3) (ASSERTED AGAINST HORIZON) (FOR NON-GOVERNMENT AND NON-CHURCH SPONSORED PLANS)

285. The foregoing allegations are re-alleged and incorporated by reference as if fully set forth herein.

286. Pursuant to 29 U.S.C. § 1132(a)(3), a civil action may be brought by "a participant, beneficiary, or fiduciary to (A) enjoin any act or practice which violates any provision of this

subchapter or the terms of the plan, or (B) to obtain other appropriate equitable relief (i) to redress such violations or (ii) to enforce any provisions of this subchapter or the terms of the plan."

287. Advanced Spinal, as an assignee of ERISA members and beneficiaries under the Plans, is entitled to assert a claim for relief for Horizon's breach of fiduciary duty under 29 U.S.C. § 1104(a)(1)(A) and (B).

288. Horizon is an ERISA fiduciary of its respective Plans within the meaning of 29 U.S.C. § 1002(21)(A) because, at a minimum, it exercises authority or control respecting management or disposition of Plan assets.

289. As an ERISA fiduciary, Horizon was required to make claim payment decisions under the Plans for the exclusive purpose of providing benefits to participants and beneficiaries, including Advanced Spinal as their assignees, and defray reasonable expenses in administering the Plans. 29 U.S.C. § 1104(a)(1)(A). This duty requires Horizon to avoid self-dealing or financial arrangements that benefit the fiduciary at the expense of its beneficiaries.

290. As ERISA fiduciaries, Horizon also owed Advanced Spinal a duty of loyalty, defined as an obligation to act prudently, with the care, skill, prudence and diligence that a prudent fiduciary would use in the conduct of an enterprise of like character. 29 U.S.C. § 1104(a)(l)(B).

291. Horizon violated its fiduciary duty of loyalty and care, and engaged in prohibited transactions, through myriad acts of self-dealing, described more fully above. Among other things, Horizon retained Plan funds that should have been paid to Advanced Spinal and used them to pay itself and third-party repricing companies unjustified, undisclosed, and improper "cost containment fees."

292. Pursuant to 29 U.S.C. § 1132(a)(3), Advanced Spinal is entitled to equitable relief to remedy Horizon's self-dealing and other violations of its ERISA fiduciary duties, including

declaratory and injunctive relief. Advanced Spinal is also entitled to seek equitable relief under 29 U.S.C. § 1109(a), including for breach of fiduciary duty by not providing covered for benefits to beneficiaries' assignees.

**CLAIM VII**

**BREACH OF CONTRACT**
**(ASSERTED AGAINST HORIZON)**

293. The foregoing allegations are re-alleged and incorporated by reference as if fully set forth herein.

294. To the extent that claims related to benefits or payments owed by Horizon are not associated with an ERISA-governed Plan and/or are not preempted by ERISA, Advanced Spinal is entitled, as the assignee of rights and benefits held by Horizon insureds, to maintain a breach of contract claim under New Jersey law.

295. As a result of its course of dealings, including direct communications between Advanced Spinal and Horizon regarding the treatment of and payment for treatment of a patient, including Horizon's pre-approvals, some orally over the telephone and others in writing, direct contracts were created between Advanced Spinal and Horizon for the provision of Advanced Spinal's services to the covered patients at the respective rate schedules published by Horizon.

296. For most patients, before Advanced Spinal treats them, an authorized representative of Advanced Spinal communicates directly with an authorized representative of Horizon. Those communications may be verbal or electronic. Those communications confirm, among other things, that the patient is covered by a Plan, that the treatment recommended by Advanced Spinal is covered by the Plan, that Advanced Spinal is authorized to provide the treatment as an out-of-network provider, that Advanced Spinal will be paid consistent with the Plans for such services, and the amount of any patient financial responsibility for the treatment proposed. By providing

82

the patient responsibility amount, Horizon made clear that it would pay Advanced Spinal the difference between the patient responsibility and the amount Advanced Spinal bills.

297. Advanced Spinal accepted the terms and, in reliance upon the agreed terms, provided the proposed treatments to the patients, and complied with the terms of the implied contract by following Horizon's procedures and submitting invoices consistent and within the parameters of Horizon's guidelines and published rate schedules.

298. After the treatments were provided to Horizon insureds, Advanced Spinal submitted claims to it.

299. Horizon did not pay the submitted claims as agreed to by it and Advanced Spinal. Rather, Horizon materially breached the agreements by causing unwarranted delay, then refusing to pay the claims Advanced Spinal submitted, or grossly underpaying the claims consistent with its own guidelines in breach of the agreed terms.

300. Advanced Spinal complied with the terms of the contracts with Horizon, including provision of medical services to Horizon insureds, save and except those excused by Horizon's material breaches.

301. As a direct and proximate result of Horizon's material breaches of the direct contractual agreements with Advanced Spinal, including without limitation the non-payment or unexcused underpayment of Advanced Spinal's bill for services provided, Advanced Spinal suffered damages, in amounts to be proven at trial.

302. As the result of Horizon's failure to comply with the terms of the Plans, Advanced Spinal, as assignee, has suffered damages and lost benefits for which it is entitled to recover damages from Horizon, including unpaid benefits, restitution, interest, and other contractual damages sustained by Advanced Spinal.

## CLAIM VIII

### BREACH OF IMPLIED CONTRACT
### (ASSERTED AGAINST HORIZON)

303. The foregoing allegations are re-alleged and incorporated by reference as if fully set forth herein.

304. Advanced Spinal has implied contracts with Horizon premised on both Horizon's published reimbursement calculations for out-of-network providers and its numerous discussions with Horizon's employees regarding the medical services provided.

305. Advanced Spinal provided services to Horizon insureds with the expectation that Horizon would compensate it in accordance with Horizon's published guidelines and, in some instances, communications with Horizon's representatives.

306. Advanced Spinal's billing practices are consistent with Horizon's guidelines such that the entire incurred amount should have been paid. Advanced Spinal bills its services at a reasonable and customary rate. Horizon generally agrees to pay reasonable and customary rates for services that out-of-network providers, like Advanced Spinal, provide to Horizon insureds.

307. Horizon breached the implied contract by failing to make payment of benefits to Advanced Spinal in the manner and amounts required under the terms of the Plans or as otherwise conveyed by Horizon's representatives to Advanced Spinal.

308. Advanced Spinal complied with the terms of its implied contracts with Horizon, including provision of medical services to Horizon insureds, except those excused by Horizon's material breaches.

309. As a direct and proximate result of Horizon's failure to comply with the terms of the plans, Advanced Spinal has suffered harm and lost benefits for which it is entitled to recover damages from Horizon, including unpaid benefits, restitution, interest, and other contractual

damages sustained, in amounts to be proven at trial.

## CLAIM IX

### BREACH OF THE DUTY OF GOOD FAITH AND FAIR DEALING
### (ASSERTED AGAINST HORIZON)

310. The foregoing allegations are re-alleged and incorporated by reference as if fully set forth herein.

311. Each of the agreements pleaded above exists and contains an implied duty of good faith and fair dealing.

312. As set forth more fully above, upon information and belief, the Plans require payment of medical expenses incurred for treating Horizon insureds.

313. For those contracts not directly between Advanced Spinal and Horizon, Advanced Spinal received an assignment of benefits for each of the claims at issue. Advanced Spinal was assigned the right to receive payment under the Plans for the services rendered to Horizon insureds. Pursuant to said assignments, Horizon is contractually obligated to pay Advanced Spinal for these services.

314. Upon information and belief, the non-ERISA Plans did not prohibit the members from assigning their rights to benefits to Advanced Spinal, including the right of direct payment of benefits. If some ERISA Plans prohibited the assignment of benefits to Advanced Spinal, then Horizon waived any anti-assignment provisions, ratified the assignment of benefits, and waived or is estopped from using any anti-assignment provisions against Advanced Spinal due to Horizon's course of dealing with and representations to Advanced Spinal.

315. Section 17:29B-3 *et seq.* of the New Jersey code defines the public interests of New Jersey and prohibits unfair methods of competition and unfair or deceptive acts or practices in the business of insurance.

85

316. Horizon breached its duty of good faith and fair dealing owed to Advanced Spinal, as an assignee of rights and benefits under the Plans, in a number of ways, described more fully above.

317. In undertaking the wrongful conduct described in the preceding paragraph, Horizon acted in bad faith with the purpose of depriving Advanced Spinal of the reasonable expectations and benefits of the contracts, both the direct contracts between Advanced Spinal and Horizon, as well as those between Horizon and Advanced Spinal's assignors.

318. Horizon's wrongful conduct, in derogation of its duty of good faith and fair dealing under the contracts, caused Advanced Spinal to suffer damages, in amounts to be proven at trial.

## CLAIM X

### UNJUST ENRICHMENT
### (ASSERTED AGAINST HORIZON)

319. The foregoing allegations are re-alleged and incorporated by reference as if fully set forth herein.

320. Advanced Spinal is entitled to maintain an unjust enrichment claim against Horizon for payment owing for services rendered to Horizon insureds.

321. By and through its failure to process claims and issue benefits for services rendered by Advanced Spinal in accordance with the Plans through which the insureds received benefits, Horizon has retained moneys to which it is not entitled and to which Advanced Spinal is entitled for services rendered to Horizon insureds.

322. Retention of this benefit is unjust and inequitable.

323. Advanced Spinal has suffered damages as a direct and proximate result of Horizon's actions.

## CLAIM XI

## QUANTUM MERUIT
### (ASSERTED AGAINST HORIZON)

324. The foregoing allegations are re-alleged and incorporated by reference as if fully set forth herein.

325. Advanced Spinal provided services and other things of value to Horizon and Horizon insureds.

326. Horizon has not paid for such services and things of value.

327. Advanced Spinal, therefore, is entitled to payment from Horizon for the reasonable value of the services rendered in an amount to be proven at trial.

## JURY DEMAND

328. Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Advanced Spinal hereby requests a trial by jury on all issues so triable.

## PRAYER FOR RELIEF

WHEREFORE, Advanced Spinal demands judgment in its favor against Defendants as follows:

A. Declaring that Defendants have violated Section 1 of the Sherman Act;

B. Declaring that Defendants have violated Section 2 of the Sherman Act;

C. Declaring that Horizon has breached the terms of the Plans with regard to out-of-network benefits;

D. Awarding Advanced Spinal all benefits due and owing to it;

E. Awarding injunctive relief to prevent Horizon from continuing to engage in the alleged conduct that is unauthorized and prohibited by the Plans and applicable law and governing Plans;

87

F. Advanced Spinal's administrative claims have been exhausted;

G. Declaring that Horizon violated its fiduciary duties under 29 U.S.C. § 1104, and awarding injunctive, declaratory and other equitable relief to redress such violations with respect to the non-government and non-religious health Plans;

H. Awarding profits, contractual damages, and compensatory damages in such amounts as the proofs at trial shall show;

I. Awarding restitution and/or disgorgement for payments improperly withheld by Horizon;

J. Declaring that Horizon has violated the terms of the relevant Plans and/or policies of insurance covering the insureds;

K. Awarding reasonable attorneys' fees, as provided by common law, federal or state statute, Plan documents, or equity, including 29 U.S.C. § 1132(g) and the Clayton Act, 15 U.S.C. § 15;

L. Awarding costs of suit;

M. Awarding pre-judgment and post-judgment interest as provided by common law, federal or state statute or rule, or equity;

N. Awarding applicable, treble, multiple, punitive, and/or other damages, in the amount to be determined at trial; and

O. Awarding all other relief to which Advanced Spinal is entitled.

[<em>Signature Page on Following Page</em>]

Dated: March 7, 2025

**MCKOOL SMITH, P.C.**

*/s/ David Schiefelbein*
David Schiefelbein
dschiefelbein@mckoolsmith.com
Hal M. Shimkoski
hsimkoski@mckoolsmith.com
1301 Avenue of the Americas, 32nd Floor
New York, New York 10001
T: (212) 402-6400
F: (212) 402-9444

Jon Corey
jcorey@mckoolsmith.com
1717 K Street NW, Suite 1000
Washington, D.C. 20006
T: (202) 370-8300
F: (202) 370-8344

***Attorneys for Plaintiffs***

89

## CERTIFICATION UNDER LOCAL CIVIL RULE 11.2

I certify that the matter in controversy is not the subject matter of any other action pending

in any court or of any pending arbitration or administrative proceeding.

Dated: March 7, 2025

**MCKOOL SMITH, P.C.**

*/s/ David Schiefelbein*
David Schiefelbein
dschiefelbein@mckoolsmith.com
1301 Avenue of the Americas, 32nd Floor
New York, New York 10001
T: (212) 402-6400
F: (212) 402-9444

***Attorneys for Plaintiffs***

90

## CERTIFICATION UNDER LOCAL CIVIL RULE 201.1

I certify under penalty of perjury that the matter in controversy is not eligible for compulsory arbitration because the relief sought does not consist only of money damages and the amount at issue exceeds $150,000, exclusive of interest and costs.

Dated: March 7, 2025

**MCKOOL SMITH, P.C.**

*/s/ David Schiefelbein*
David Schiefelbein
dschiefelbein@mckoolsmith.com
1301 Avenue of the Americas, 32nd Floor
New York, New York 10001
T: (212) 402-6400
F: (212) 402-9444

***Attorneys for Plaintiffs***